**EXCALIBUR OIL, INC., Plaintiff,**

v.

**Larry N. SULLIVAN, Defendant.**

**No. 84 C 8881.**

United States District Court,
N.D. Illinois, E.D.

Aug. 14, 1985.

acted as an agent or representative of the Trust Fund with respect to all of the wrongful acts alleged in the complaint.

Michael P. Myers, Arthur T. Susman, Joseph, Susman & Myers, Chicago, Ill., for plaintiff.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Excalibur Oil, Inc. ("Excalibur")[1] has sued Larry Sullivan ("Sullivan")[2] under a melange of federal and state securities laws and under Illinois common law, claiming it suffered damages as a result of Sullivan's alleged misrepresentations in connection with a sale of securities to Excalibur. Sullivan now moves to dismiss under Fed.R.Civ.P. ("Rule") 12(b)(6). For the reasons stated in this memorandum opinion and order, Sullivan's motion is denied in principal part and granted to a narrow extent.

### Facts[3]

During 1983 Oil Development Company ("ODC") was engaged in the business of

---

1. Excalibur is an Illinois corporation with its principal place of business in South Barrington, Illinois (Complaint ¶ 1).

2. Excalibur's Second Amended Complaint (the "Complaint") reflects its third effort to state a cause of action, and Sullivan is the sole remaining defendant of a group Excalibur originally tried to sue here. As this opinion reflects, the third try proves the charm almost entirely.

3. As with every motion to dismiss, this Court accepts as true the well-pleaded factual allegations of the Complaint, with all reasonable factual inferences drawn in Excalibur's favor. *Wolfolk v. Rivera*, 729 F.2d 1114, 1116 (7th

obtaining mineral leases and drilling, completing and operating oil and gas wells in West Virginia (Complaint ¶ 5). In May 1983 ODC employees John Gable ("Gable"), Ronald Young ("Young") and J. Alan Gable (he and Gable are collectively referred to as "Gables") solicited Excalibur's President John Turetzky ("Turetzky") to purchase working interests in wells to be drilled on properties subject to existing oil and gas leases in West Virginia (Complaint ¶ 8). In connection with the solicitation, Gables and Young delivered to Excalibur (Complaint ¶ 9):

> 1. geology reports on the proposed well sites and
> 2. a May 11, 1982 title opinion prepared by Sullivan, relating to one proposed site known as the Jackson property.

Sullivan, an attorney, had previously prepared title opinions for Gable on other properties in which Gable had a leasehold interest (Complaint ¶ 11(c)).

On May 24, 1983 Turetzky met with Gable in Davisville, West Virginia to discuss Excalibur's purchase of working interests in two wells to be drilled: one (known as Jackson # 6) on the Jackson property and the other (known as Lambert # 2) on another parcel called the Lambert property (Complaint ¶ 10). Gable represented to Turetzky that no liens had been created on the Jackson lease since 1982 (when Sullivan had prepared the title report) and that ODC had no undisclosed liabilities (Complaint ¶ 11(a)). Turetzky told Gable Excalibur required assurances, including current title opinions on the two properties, that the oil leases on the properties were free of encumbrances (Complaint ¶ 11(b)).

Having told Turetzky Sullivan did all of Gable's title work (Complaint ¶ ¶ 11(c) and 11(e)), Gable took Turetzky to an office across the hall from Gable's office to meet Sullivan (Complaint ¶ 11(d)). At that meeting Turetzky repeated to Sullivan that before Excalibur would invest in the wells it needed assurances of unencumbered prop-

erty leases, and he therefore asked Sullivan to prepare up-to-date title opinions (Complaint ¶ 11(f)). Sullivan responded (*id.*):

> [N]o problem. I know that the leases are clean. It is just a matter of getting the paperwork out to you.

Turetzky told Sullivan to bill Excalibur for his legal services rendered in preparing the title opinions, and Sullivan agreed to do so (Complaint ¶ 12).

On July 1, 1983 Gable visited Excalibur's offices in Illinois and the parties executed two participation and operating agreements, pursuant to which Excalibur was to purchase a 50% working interest in each of the to-be-drilled Jackson # 6 and Lambert # 2 wells (Complaint ¶ 13). Those agreements were subject to a warranty of title "against claims of persons claiming by, through or under" ODC (Complaint ¶ 14).

On July 28, 1983 Turetzky telephoned ODC and spoke with Young, saying Excalibur would not deliver funds in connection with the property agreements unless it received assurances the leases were clear of encumbrances (Complaint ¶ 15(a)). Young connected Turetzky with Sullivan, who again said there was "no problem" with the leases and he was just behind in preparing his paperwork (Complaint ¶ 15(d)). In reliance on Sullivan's statements, Excalibur delivered $270,000 to ODC in accordance with their agreement (Complaint ¶ 16).

On August 23, 1983 Excalibur and ODC entered into a third participation and operating agreement, under which Excalibur was to purchase a 50% working interest in a third proposed well, Lambert # 3 (Complaint ¶ 17). That agreement too was subject to a comparable warranty of title (Complaint ¶ 18). During September 1983, based on Sullivan's earlier representations about the Lambert property, Excalibur delivered $135,000 to ODC (Complaint ¶ 19).

On October 21, 1983, at a meeting attended by Turetzky, Excalibur Chairman Thomas Falese, Gable, Young and Sullivan, Falese and Turetzky again asked Sullivan to provide Excalibur with written title opin-

Cir.1984). No actual findings of fact are made     or implied by that approach.

ions. Sullivan once more said he would do so but was just behind in his paperwork. At the meeting Sullivan acknowledged the existence of a $1 million mortgage security agreement and assignment of production to Halliburton Company (the "Halliburton Agreement") affecting the Jackson lease, but he said it did not encumber Excalibur's interest in Jackson # 6 (Complaint ¶ 20).

Complaint ¶ 21 and 22 charge Sullivan's statements at the May 24 and July 28, 1983 meeting and his other representations were false in that:

1. ODC's Jackson property lease (and hence Jackson # 6) was actually encumbered by:

> (a) the Halliburton Agreement and
> (b) a July 22, 1983 mortgage and conditional assignment in the amount of $100,000 to Buckeye Crude Exploration, Inc.

2. ODC's Lambert property lease (and thus Lambert # 2 and # 3) was subject to an August 24, 1983 mortgage and conditional assignment in the amount of $100,000 to Buckeye Crude International, Inc.

3. Both leases were subject to numerous mechanic's and judgment liens.

### Excalibur's Claims

Excalibur advances a battery of claims against Sullivan, some on the theory he was ODC's attorney and agent and others predicated on his acting as Excalibur's attorney and agent.[4] Counts I–III assert common law claims stemming from Sullivan's alleged misrepresentations and based on several theories:

1. negligence (Count I);
2. breach of Sullivan's fiduciary duty as Excalibur's attorney (Count II); and
3. breach of Sullivan's contract with Excalibur to provide updated title opinions (Count III).

Counts IV–VIII allege violations of various federal and state securities laws:

1. Securities Exchange Act of 1934 ("1934 Act") § 10(b) ("Section 10(b)"), 15 U.S.C. § 78j(b), and related Rule 10b–5, 17 C.F.R. § 240.106–5 (Count IV);

2. Securities Act of 1933 ("1933 Act") § 17(a) ("Section 17a"), 15 U.S.C. § 77q(a) (Count V);

3. 1933 Act § 12(2) ("Section 12(2)"), 15 U.S.C. § 77l (Count VI);

4. Illinois Securities Law of 1953 as amended ("Illinois Act") §§ 5, 6 and 7, Ill. Rev.Stat. ch. 121½, ¶¶ 137.5, 137.6 and 137.7 (citations to the Illinois Act will also take the form "Section—," omitting the prefatory 137.) (Count VII); and

5. Uniform Securities Act of West Virginia ("West Virginia Act") §§ 32–1–101, 32–2–202 and 32–4–410, W.Va.Code §§ 32–1–101, 32–2–202 and 32–4–410 (again this opinion's citations will take the form "Section—," this time omitting the prefatory 32–) (Count VIII).

### Sullivan's Responses

In support of his motion Sullivan contends:

1. All counts should be dismissed as to the Lambert property transactions, because Excalibur has not alleged the Lambert property was encumbered when Sullivan made his representations.

2. Excalibur's breach of contract claim is defective because the failure to prepare title opinions was not the proximate cause of Excalibur's damages.

3. No action exists under Section 10(b) or Rule 10b–5 for an attorney's misrepresentations or omissions as to his or her own client.

4. Excalibur's Section 17(a) claim is defective in three respects:

---

**4.** Of course it is not necessarily inconsistent to allege Sullivan represented both parties. Dual representation may be undertaken by lawyers on satisfying ethically-imposed conditions. ABA Code of Professional Responsibility DR 5–105; and see, e.g., *Westinghouse Electric Corp. v. Gulf Oil Corp.,* 588 F.2d 221, 229 (7th Cir.

1978). Under the new ABA Model Rule of Professional Conduct 1.7, such concurrent representation continues to be permissible where the clients consent after consultation and the attorney reasonably believes such representation will not harm his relationship with the original client.

(a) Section 17(a) does not provide for an action by a client against his own attorney.

(b) Complaint ¶ 138 alleges wrongful conduct "in connection with the *purchase* of working interests by Excalibur," while the 1933 Act requires wrongful conduct in connection with the *sale* of securities.

(c) Liability under the 1933 Act extends only to sellers and offerors or those who aid and abet them. Excalibur has not alleged Sullivan fits any of those categories.

5. Sullivan does not belong to any of the categories of persons that may be held liable under:

(a) Section 12(2);

(b) the Illinois Act; or

(c) the West Virginia Act.

Each of those contentions will be dealt with in turn.

### *Lambert Transactions*

Sullivan points out Excalibur has not identified a single specific encumbrance that affected the Lambert property at the time Sullivan represented both properties were encumbrance-free. Complaint ¶ 21 identifies two encumbrances on the Jackson property. Complaint ¶ 22 specifies a mortgage on the Lambert property dated August 24, 1983, nearly one month after the last of Sullivan's representations as to title. Apart from those three specific encumbrances, Excalibur alleges only (Complaint ¶ 22):

> [T]he leases are subject to additional claims, liens or encumbrances as follows:
>
> \*     \*     \*     \*     \*     \*
>
> (b) Numerous mechanic's liens; and
>
> (c) Numerous judgment liens.

Sullivan argues that unless his statements misrepresented the state of the Lambert title, Excalibur can show no causal nexus between those statements and any damages Excalibur sustained through the Lambert investments. He says each transaction must be analyzed separately, and

any link between his misrepresentations as to the Jackson property and Excalibur's losses on the Lambert wells is too attenuated to sustain liability under any theory of recovery, whether in contract or tort or under the securities laws. And Sullivan urges Excalibur's allegation of "numerous" mechanic's and judgment liens encumbering "the leases" is so vague as to be insufficient under Rule 9(b) to allege an encumbrance on the Lambert property.

■ Excalibur's responsive memorandum clarifies it is *not* claiming the Lambert property was encumbered at the time of Sullivan's misrepresentations. Instead Excalibur argues Sullivan's misrepresentations as to the Jackson property proximately caused the Lambert damages because Excalibur would not have entered into the Lambert investments had Sullivan truthfully represented the status of the Jackson title.

It will be recalled Turetzky was first referred to Sullivan May 24, 1983, to confirm Gable's representation as to the absence of new liens on the Jackson property since Sullivan's preparation of his May 11, 1982 title opinion. Complaint ¶ 23 then alleges that if Sullivan had told Turetzky the truth about the encumbrances on *that* property:

> Excalibur would have realized that Gable was not trustworthy and honest, would have been on notice that the financial condition of Oil Development Company was not as represented, would not have consummated [the Jackson # 6/Lambert # 2 deal], and would not have entered into [the Lambert # 3 investment].

Under the operative rules for reading complaints for Rule 12(b)(6) purposes, that states a sufficient nexus between Sullivan's misrepresentations and Excalibur's losses as to both the Jackson and the Lambert wells.

### *Breach of Contract*

■ That analysis also disposes of Sullivan's claim of no causal connection between Excalibur's losses and Sullivan's failure to prepare current title opinions. Sulli-

van Mem. 4 asserts a nonsensical argument in that respect:

> Had Sullivan prepared title opinion [sic], plaintiff would have been damaged nonetheless. The report simply would have informed plaintiff that there were problems with its investment (assuming the alleged encumbrances existed).

To the contrary, Complaint ¶ 23 says a truthful title opinion would have told Excalibur much more than "that there were problems with its investment." It would also have informed Excalibur Gable was "not trustworthy" and ODC was in worse financial shape than it let on. And Excalibur would not "have been damaged nonetheless," for it would have backed out of the deal.[5]

Sullivan R.Mem. 6–7 altered his causation argument somewhat, but the new version is as untenable as the original. Sullivan contends Excalibur cannot assume his report—even if timely—would have been accurate. That would render it speculative to say the lack of a timely report caused Excalibur's injuries. Moreover, Sullivan argues, an inaccurate report would give rise to liability only in tort (malpractice), not contract.

Those new arguments—premised as they are on an unnaturally minimalist conception of the Excalibur-Sullivan contract—violate the command in *Wolfolk* (see n. 3) to view the Complaint's allegations in the light most favorable to Excalibur. According to Complaint ¶ ¶ 11(f) and 12, Excalibur told Sullivan it required assurances of clear title before investing in the wells, and Sullivan then agreed to prepare current title opinions. Surely a reasonable inference from those allegations is that Sullivan knew time was important and agreed to have the opinions completed before Excalibur was required to deliver funds.

There is something terribly offensive about a lawyer's assertion that his contract to prepare a title opinion called for nothing more than his delivery of an unreliable piece of paper. Necessarily implicit in any such contract is the lawyer's duty to investigate the title with reasonable diligence and to report his findings accurately. Sullivan's failure to fulfill those obligations would certainly amount to a breach of contract. And if Sullivan indeed failed either to discover an obvious encumbrance or to report it to Excalibur, no speculation is involved in concluding the breach was a proximate cause of Excalibur's losses.

■ Finally Sullivan R.Mem. 7–8 argues in the alternative:

> 1. Sullivan had no contractual obligation to deliver the written opinions before Excalibur delivered funds to ODC.
>
> 2. Even if Sullivan had such an obligation, Excalibur waived it by tendering funds to ODC based on Sullivan's oral representations.

This opinion has already disposed of the first of those arguments. As for the second, even if the Complaint supported a waiver theory (as it does not), and even if such a fact-based question could appropriately be decided on a motion to dismiss (as it cannot), at most Sullivan can claim Excalibur waived Sullivan's obligation to make timely delivery of a document memorializing his opinion. Under the Complaint Sullivan does not (and cannot) argue Excalibur also waived Sullivan's contractual obligations (1) to investigate the titles and (2) accurately to report his findings before the delivery of funds. Excalibur may well have believed Sullivan's oral representations just before Excalibur's payment to ODC were based on an investigation undertaken pursuant to Sullivan's contract with Excalibur.

### Attorney-Client Relationship Issues

Sullivan spins out an elaborate analysis of why a client should not be able to invoke Rule 10b–5 to sue his or her own attorney for misrepresentations or omissions. Sullivan urges Rule 10b–5 was designed only to protect buyers from misrepresentations by sellers acting at arm's length to advance

---

5. That allegation in Complaint ¶ 23 is consistent with the Complaint's several other allegations that Excalibur told ODC it would not go ahead without assurances of clear title.

their own adverse interests. Moreover, Sullivan Mem. 7–8 argues the scope of an attorney's duties to a client is determined exclusively by the terms of the agreement under which the client retained the attorney.

▮ Where Sullivan jumps the tracks is in his premise that Excalibur has sued Sullivan only as *its* attorney. True enough, portions of the Complaint—such as Count I's breach of contract claim and Count II's breach of fiduciary duty claim—are predicated on an alleged lawyer-client relationship between Sullivan and Excalibur. But the securities law claims treat Sullivan as ODC's attorney, or indeed as attorney for *both* Excalibur and ODC.[6] Even were the different claims inconsistent (and they are not necessarily so), that is entirely permissible under the Rules. See 5 Wright & Miller, *Federal Practice and Procedure: Civil* § 1283 (1969), explaining that facet of Rule 8(e)(2).

▮ That obviates any need to decide whether Section 10(b) and Rule 10b–5 permit a client's suit against his or her attorney. There is clearly enough to support the reasonable inference Sullivan acted as ODC's attorney, even if he simultaneously purported to act (or Excalibur reasonably believed he was acting[7]) as Excalibur's attorney:

1. Gable introduced Sullivan to Turetzky as the attorney "who did all of Gable's title work" (Complaint ¶ 11(e)).

2. Sullivan had prepared a title opinion for Gable on the Jackson property in 1982, just a year before the transactions at issue here (Complaint ¶ 9(b)).

3. Gable's very introduction of Turetzky to Sullivan in response to Turetzky's request for assurances regarding the title implied Sullivan was Gable's

agent and was empowered to make representations for Gable.

4. Sullivan's office was just across the hall from Gable's (Complaint ¶ 11(d)).

5. Sullivan sat in with Gable and others on at least one meeting with Excalibur representatives (Complaint ¶ 20).

Nothing flows from the absence of a Complaint allegation specifically identifying Sullivan as ODC's attorney.

Sullivan concedes that nothing in Section 10(b) or Rule 10b–5 exempts the *seller's* lawyer from liability to a purchaser merely because of his or her status as attorney. As Judge Friendly put it in *SEC v. Frank*, 388 F.2d 486, 489 (2d Cir.1968):

[A] lawyer, no more than others, can (sic) escape liability for fraud by closing his eyes to what he saw and could readily understand.

That especially holds true where the attorney is sued on the basis of his or her affirmative misrepresentation, rather than merely as a passive participant in the alleged fraud. *Sohns v. Dahl*, 392 F.Supp. 1208, 1213 n. 8 (W.D.Va.1975) ("A license to practice law would not clothe an individual with armor against his direct misrepresentations to a purchaser or seller").

Precisely the same analysis applies to Sullivan's arguments that Section 17(a):

1. does not permit a client's suit against his or her attorney; and

2. requires wrongful conduct in connection with the *sale* rather than the *purchase* of securities.

To the extent Excalibur has sued Sullivan in his capacity as ODC's agent and counsel, Excalibur has not (1) sued its own lawyer or (2) sued Sullivan for purchaser-oriented activities. Its action against Sullivan is

---

**6.** Excalibur did not address the matter in these terms in its response to Sullivan's motion, instead taking the position a client may sue his or her *own* attorney under Section 10(b) and Rule 10b–5. But the Complaint certainly lends itself to the interpretation Sullivan was ODC's attorney, and Excalibur Mem. 7 treats Sullivan as attorney for both parties.

**7.** Existence of an attorney-client relationship may be established by the client's reasonable perception, as well as by the more common consensual basis for such a relationship. *Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1316–20 (7th Cir.1978).

rather based on his participation with ODC in carrying out a fraudulent sale.[8]

### Sullivan as a Proper Securities Law Defendant

Sullivan's remaining attacks are on the propriety of suing him under any of the securities laws Excalibur calls upon. That necessitates a separate look at each statutory provision.

#### 1. Sections 12(2) and 17(a)

Sections 12(2) and 17(a) speak in nearly identical terms in specifying who may be held liable.[9] Despite that parallel language, some of the case law has expanded liability under Section 17(a) to a broader range of persons than under Section 12(2).

Thus Section 17(a) labels as equivalent to a "seller"—and therefore renders liable—anyone who merely "aids and abets" in a sale. *SEC v. Coven,* 581 F.2d 1020, 1028 (2d Cir.1978). By contrast, although a number of courts have similarly extended Section 12(2) liability to all those who participate actively in the illegal sale of securities (see, e.g., *In re Caesars Palace Securities Litigation,* 360 F.Supp. 366, 383 (S.D. N.Y.1973)), other authority (see, e.g., the discussion in *Briggs v. Sterner,* 529 F.Supp. 1155, 1172–73 (S.D.Iowa 1981)) has rejected the "aiding and abetting" theory under that section.

■ For present purposes, however, any such distinction is wholly academic. As the following discussion reflects, Sullivan qualifies as a seller even under a narrower reading of Section 12(2), thus rendering unnecessary any analysis in broader Section 17(a) terms.

Sullivan claims his preparation of title reports for ODC—both the 1982 title report on the Jackson property and like reports on unrelated properties—form an insufficient

basis to impose "seller" liability. Citing *Pharo v. Smith,* 621 F.2d 656 (5th Cir.), *reh'g granted and case remanded,* 625 F.2d 1226 (5th Cir.1980), he says his "mere participation" in the events leading up to the transactions does not make him a statutory seller.

But *Pharo* is of no consolation to Sullivan. Unlike its generalized language (which requires a fleshing out of the "mere participation" notion), numerous authorities (as exemplified by *Junker v. Crory,* 650 F.2d 1349, 1360 (5th Cir.1981) (reaffirming *Pharo), SEC v. Seaboard Corp.,* 677 F.2d 1289, 1294 (9th Cir.1982) and *Hagert v. Glickman, Lurie, Eiger & Co.,* 520 F.Supp. 1028, 1035 (D.Minn.1981)) contain more precise formulations of what the "seller" concept embraces.

Sullivan clearly falls within any of those formulations as much more than a "mere participant." His representations as to title were certainly "a substantial factor in causing the transaction[s] to take place" (*Junker*). Excalibur's injury "flowed directly and proximately from the actions" (*Seaboard*) of Sullivan—in the classic tort-liability sense requiring only "a" rather than "the" proximate cause. And in *Hagert's* terms, Sullivan was "uniquely positioned to ... acquire material information [and] disclose his findings" with regard to the crucial condition of title.

#### 2. Illinois Act

Illinois Act Section 5 requires securities registration by the issuer, controlling person or dealer. Section 13, which establishes rescission as the exclusive civil remedy of a defrauded purchaser (see this Court's opinion in *Guy v. Duff & Phelps, Inc.,* No. 84 C 2813, slip op. at 20–21 (N.D.Ill. July 12, 1985)) or the purchaser of an unregistered security, limits the class of potential defendants to (Section 13A):

---

**8.** Sullivan's purchase/sale contention (Sullivan Mem. 4) is assertedly based on the language of Complaint ¶ 138, which alleges Sullivan acted wrongly in connection with the *"purchase* of working interests by Excalibur from Oil Development Company."* Of course that would not be a tenable reading of the allegation, and Sullivan's "argument" is at best disingenuous.

**9.** Section 12(2) liability extends to "any person ... who offers or sells a security" under fraudulent circumstances by means of interstate commerce. Section 17(a) similarly refers to fraudulent conduct by "any person in the offer or sale of securities."

The issuer, controlling person, underwriter, dealer or other person by or on behalf of whom the sale was made, and each underwriter, dealer, or salesperson who shall have participated or aided in any way in making such sale. . . .

See, *Shofstall v. Allied Van Lines, Inc.,* 455 F.Supp. 351, 358 (N.D.Ill.1978).

In Illinois Act terms Excalibur alleges:

1. ODC never registered or qualified the working interests sold to Excalibur.

2. That nonregistration entitles Excalibur to rescission under Section 13.

3. Sullivan, as a "salesperson who . . . participated or aided" in the sale, is liable for the rescissionary damages.

Sullivan retorts:

1. No allegations of fact place him within the category of those liable under Section 13.

2. In particular, his past occasional employment by ODC in preparing the 1982 Jackson property title report and other title reports does not render him a "salesperson" under Section 137.2–9:

"Salesperson" means an individual, other than an issuer or a dealer, employed, authorized or appointed by a dealer, issuer or controlling person to sell securities.

No reported Illinois case has interpreted that definition of "salesperson." This Court is therefore left with the statutory language alone.

But as an aid to construction, it is profitable to compare the scope of the Illinois Act with that of the 1933 and 1934 Acts, under which this opinion has already found Sullivan potentially liable. *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967) teaches the 1933 Act falls into the category of remedial legislation, hence to be broadly construed. And the same is true of the 1934 Act. Not only do the federal statutes afford victims of security fraud a broad range of remedies, but each of Sections 10(b), 12(2) and 17(a) defines those liable for its violation as including "any person" acting in connection with, or in, the offer or sale of any securities. Understandably, then, the cases discussed earlier show how federal courts have read that language expansively to encompass all sorts of persons who participate materially in security sales.

By contrast, the Illinois Act is a far more restrictively structured statute. As this Court held in *Guy,* it affords only a rescissionary (and not a damages) remedy for violations. Moreover, it more carefully lists and defines the specific classes of persons who may be subjected to liability. Those classes comprise persons who regularly play central and specialized roles in securities transactions and who, pursuant to Section 8, must themselves be registered with the Secretary of State.

Importantly, lawyers are *not* among those specifically required to be so registered. And after all, Excalibur seeks to characterize a lawyer, retained only to render legal services, as having been "employed, authorized or appointed by [ODC] to sell securities."

That would do impermissible violence to the normal meaning of language. Gable and others, not Sullivan, solicited Excalibur and induced it to invest in the wells. Excalibur had been "sold" on the desirability of the investment before it ever met Sullivan. He was asked only to confirm that the deal conformed to a portion of Gable's description, and it was Gable's description that had already provided all the information on the strength of which Excalibur agreed to purchase. Sullivan's role in the transaction simply did not render him a "salesperson."[10]

---

10. Indeed, as noted by Bruns and Haskin, *Illinois Law Relating to Securities Dealers, Salesmen and Investment Advisers,* 1961 U.Ill.L.F. 240, 245:

Activities of a typical salesman consist of dealing in securities of varying qualities issued by numerous issuers of varying sizes and widely divergent lines of business. He must know something of how the market operates. He is often called upon to advise customers on the composition of their portfolios as well as on the quality of a particular investment.

### 3. *West Virginia Act*

 Quite unlike the Illinois Act (and much like the 1933 and 1934 Acts), the West Virginia Act extends civil liability to a broad category of persons involved in the fraudulent sale of securities. Section 4–410(b) imposes liability not only on the seller "but on every broker-dealer or agent who materially aids in the sale." It goes on to define "agent" broadly as:

> any individual other than a broker-dealer who represents a broker-dealer or issuer in effecting or attempting to effect purchases or sales of securities.

As with the Illinois Act, no West Virginia case interpreting the statute has been cited to this Court.

Sullivan maintains:

> 1. His earlier title work for Gable did not constitute the work of an agent "in effecting or attempting to effect [the] purchases or sales of securities."

> 2. ODC never retained him for the purpose of being its agent.

But Sullivan glosses over the more direct role he played in the sales to Excalibur. On the Complaint's allegations, his face-to-face and direct telephonic representations to Turetzky, at the special request of ODC, were of the very essence of agency.[11] And there is equally no doubt (to quote the statute) that he "materially aid[ed]" in "effecting" the sales.

### *Conclusion*

Only Complaint Count VII succumbs to Sullivan's Rule 12(b)(6) motion and is dismissed. In all other respects the Complaint survives. Sullivan is ordered to answer the Complaint on or before August 26, 1985.

---

11. This conclusion highlights the difference between the "agent" coverage of the West Virginia Act and the narrower "salesperson" coverage of the Illinois Act.