EXCALIBUR OIL, INC., Plaintiff,

v.

Larry SULLIVAN, Defendant.

No. 84 C 8881.

United States District Court,
N.D. Illinois, E.D.

May 14, 1987.

Michael P. Myers, Chicago, Ill., Howard Z. Gopman, Skokie, Ill., for plaintiff.

Thomas L. Browne, Hinshaw, Culbertson, Melmann, Hoban & Fuller, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

■ Excalibur Oil, Inc. ("Excalibur") has sued Larry Sullivan ("Sullivan") under federal and state securities laws and under Illinois common law, claiming damages as a result of Sullivan's alleged misrepresentations in connection with a sale of securities to Excalibur. Now two motions have been filed:

1. Excalibur moves under Fed.R. Civ.P. ("Rule") 15(a) "for leave to file a Third Amended Complaint adding Jerry Turetzky ["Turetzky"], Excalibur Oil & Gas Program 1983-5, an Illinois limited partnership ["Oil & Gas 83-5"], and Excalibur Oil & Gas Program 1983-6 ["Oil & Gas 83-6"], an Illinois limited partnership, as additional parties plaintiff...."[1]

---

**1.** Actually the proposed Third Amended Complaint describes plaintiffs this way:

Now come plaintiffs, Excalibur Oil, Inc. ("Excalibur") and [Turetzky], individually and as general partners doing business as [Oil & Gas 83-5 and Oil & Gas 83-6]....

In addition to adding plaintiffs, the Third Amended Complaint includes other modifications of which the motion makes no mention. This opinion will identify and discuss those changes later. Parenthetically, it should be pointed out that if Excalibur were successful on its motion, Oil & Gas 83-5 and Oil & Gas 83-6 (collectively the "limited partnerships") could not sue on their state law claims in the style they propose. Rule 17(b) makes the capacity of a partnership to sue a matter of state law except when the partnership is suing to enforce federal rights. As this Court recently explained in *Stotler & Co. v. Reisinger*, No. 87 C 3029, slip op. at 1

2. Sullivan moves under Rule 56 for summary judgment.[2]

For the reasons stated in this memorandum opinion and order, Excalibur is denied leave to file the Third Amended Complaint and summary judgment is granted in favor of Sullivan.

### Procedural Background

On October 12, 1984 Excalibur (an Illinois corporation) filed its original Complaint, naming 12 defendants. After finding Excalibur had timely served only two of those defendants and after denying the request for an extension of time to serve the others, this Court dismissed the action without prejudice under Rule 4(j) as to the ten defendants who had not been timely served.[3] Excalibur's motion for reconsideration of that decision was denied (105 F.R.D. 543, 545 (N.D.Ill.1985)).

On April 4, 1985 this Court dismissed Sullivan's remaining codefendant (the Secretary of a previously-dismissed corporate defendant) because the Complaint did not ascribe any alleged acts to that individual defendant. Excalibur then filed its Second Amended Complaint May 2, 1985, naming only Sullivan as a defendant.

### Excalibur's Allegations [4]

During 1983 Oil Development Company ("ODC") was engaged in the business of obtaining mineral leases and drilling, completing and operating oil and gas wells in West Virginia (¶ 5). In May 1983 ODC employees John Gable ("Gable"), Ronald Young ("Young") and J. Alan Gable (he and Gable are collectively referred to as "Gables") solicited Excalibur's President Turetzky to purchase working interests in wells to be drilled on properties subject to existing oil and gas leases in West Virginia (¶ 8). In connection with the solicitation, Gables and Young delivered to Excalibur (¶ 9):

1. geology reports on the proposed well sites and

2. a May 11, 1982 title opinion prepared by Sullivan, relating to one proposed site known as the Jackson property.

Sullivan, an attorney, had previously prepared title opinions for Gable on other properties in which Gable had a leasehold interest (¶ 11(c)).

On May 24, 1983 Turetzky met with Gable in Davisville, West Virginia to discuss Excalibur's purchase of working interests in two wells to be drilled: one (known as Jackson # 6) on the Jackson property and the other (known as Lambert # 2) on another parcel called the Lambert property (¶ 10). Gable represented to Turetzky that no liens had been created on the Jackson lease since 1982 (when Sullivan had prepared the title report) and that ODC had no undisclosed liabilities (¶ 11(a)). Turetzky told Gable Excalibur required assurances, including current title opinions on the two properties, that the oil leases on the properties were free of encumbrances (¶ 11(b)).

(N.D.Ill. Apr. 2, 1987) [Available on WEST-LAW—DCT database], Ill.Rev.Stat. ch. 110, ¶ 2–411(a) permits an Illinois partnership *to be sued* in its firm name, but both by negative inference and under Illinois common law a partnership must *sue* in the names of all its partners.

2. For convenience in identifying the source of particular arguments, this opinion will refer first to the name of the party (either "E." for Excalibur or "S." for Sullivan), followed by the name of the particular document: "Mem." (for Memorandum) or "R. Mem." (for Reply Memorandum). Because Sullivan has submitted two sets of memoranda (one for each motion), his initial "S." will be followed with the number 1 (for Excalibur's motion to amend the Complaint) or 2 (for Sullivan's summary judgment motion). Excalibur has submitted only one brief addressing both motions, so identifying

numbers are unnecessary in its case. References to Turetzky's deposition will take the form "T. Dep.—."

3. In the meantime Excalibur had filed its First Amended Complaint January 8, 1985, eliminating two of the ten defendants this Court later dismissed.

4. As explained later, what follows is *not* a statement of proved facts. Instead it is principally a summary of the Second Amended Complaint, taken almost entirely from this Court's August 13, 1985 opinion (the "Opinion," 616 F.Supp. 458, 459–61), denying in principal part but granting to a narrow extent Sullivan's motion to dismiss under Rule 12(b)(6). Allegations in the Second Amended Complaint will be cited simply "¶ —." To differentiate the now-proposed Third Amended Complaint, its allegations will be cited "TAC ¶ —."

Having told Turetzky Sullivan did all of Gable's title work (¶¶ 11(c) and 11(e)), Gable took Turetzky to an office across the hall from Gable's office to meet Sullivan (¶ 11(d)). At that meeting Turetzky repeated to Sullivan that before Excalibur would invest in the wells it needed assurances of unencumbered property leases, and he therefore asked Sullivan to prepare up-to-date title opinions (¶ 11(f)). Sullivan responded (*id.*):

[N]o problem. I know that the leases are clean. It is just a matter of getting the paperwork out to you.

Turetzky told Sullivan to bill Excalibur for his legal services rendered in preparing the title opinions, and Sullivan agreed to do so (¶ 12).

On July 1, 1983 Gable visited Excalibur's offices in Illinois and the parties executed two participation and operating agreements, pursuant to which Excalibur was to purchase a 50% working interest in each of the to-be-drilled Jackson # 6 and Lambert # 2 wells (¶ 13). Each agreement provided (S–2 Mem. Ex.):

2. In consideration of [ODC's] agreement to assign such interest in the lease insofar as it covers the Drill Site to [Excalibur] and of [Excalibur's] right to participate in additional wells on the above described lease, [Excalibur] shall pay to [ODC] simultaneously with the execution of the Agreement, the sum of $____ of which five percent (5%) represents [Excalibur's] purchase price in said leasehold, and balance represents full satisfaction of [Excalibur's] drilling obligation to casing point, as set forth in paragraph 5 hereafter. It is understood that [Excalibur] shall have no further obligation for drilling, logging, coring, testing, tractor, truck, geological and engineering expenses to the casing point on this well, that above prices to [Excalibur] being turn-key prices and should the actual cost to [ODC] exceed the amount raised, [ODC] will bear all of such expenses to casing point, however should actual cost of [ODC] be less than total amount raised, [ODC] shall retain for his gross profit all of such excess funds.

Both agreements were subject to a warranty of title "against claims of persons claiming by, through or under" ODC (¶ 14).

On July 28, 1983 Turetzky telephoned ODC and spoke with Young, saying Excalibur would not deliver funds in connection with the property agreements unless it received assurances the leases were clear of encumbrances (¶ 15(a)). Young connected Turetzky with Sullivan, who again said there was "no problem" and he was just behind in preparing his paperwork (¶ 15(d)). In reliance on Sullivan's statements, Excalibur delivered $270,000 to ODC in accordance with their agreement (¶ 16).

On August 23, 1983 Excalibur and ODC entered into a third participation and operating agreement, under which Excalibur was to purchase a 50% working interest in a third proposed well, Lambert # 3 (¶ 17). That agreement too was subject to a comparable warranty of title (¶ 18). During September 1983, based on Sullivan's earlier representations about the Lambert property, Excalibur delivered $135,000 to ODC (¶ 19).

On October 21, 1983, at a meeting attended by Turetzky, Excalibur Chairman Thomas Falese, Gable, Young and Sullivan, Falese and Turetzky again asked Sullivan to provide Excalibur with written title opinions. Sullivan once more said he would do so but was just behind in his paperwork. At the meeting Sullivan acknowledged the existence of a $1 million mortgage security agreement and assignment of production to Halliburton Company (the "Halliburton Agreement") affecting the Jackson lease, but he said it did not encumber Excalibur's interest in Jackson # 6 (¶ 20).

Complaint ¶ 21 and 22 charge Sullivan's statements at the May 24 and July 28, 1983 meeting and his other representations were false in that:

1. ODC's Jackson property lease (and hence Jackson # 6) was actually encumbered by:

(a) the Halliburton Agreement and

(b) a July 22, 1983 mortgage and conditional assignment in the amount of $100,000 to Buckeye Crude Exploration, Inc.

2. ODC's Lambert property lease (and thus Lambert # 2 and # 3) was subject to an August 24, 1983 mortgage and conditional assignment in the amount of $100,000 to Buckeye Crude International, Inc.

3. Both leases were subject to numerous mechanics' and judgment liens.

### Post-Second-Amended-Complaint Developments

During the course of discovery Sullivan has learned certain information he believes entitles him to summary judgment. Disclosure of that information by Excalibur has also prompted it to seek further to amend its Complaint (as its Mem. 1 misleadingly puts it, "In discovery, the parties (sic) have determined several facts"). First, Turetzky revealed in his deposition that Sullivan did *not* represent during the May 24, 1983 meeting that any property leases were unencumbered (T. Dep. 8–9):

Q: And when you met with Mr. Sullivan, what did you say to him and what did he say to you? And I'd like you to use exact words to the extent you can recall.

A: Okay. I was introduced to him by Mr. Gable. I was aware that he was the individual who drew—the previous title opinion because it was signed, and I asked him if he would update the title opinions on the Lambert and the Jackson leases to current, and he said no problem. That is all the specific language that I can remember.

Q: Did you discuss anything else with Mr. Sullivan on May 24, 1983?

A: No, it was a very brief conversation.

Faced with that admission, E. Mem. 2 now says:

At discovery, the content of those two conversations has been clarified. At the

May meeting, Sullivan agreed to investigate title to the Jackson and Lambert leases and to provide current reports relating to them. At that meeting, he did not represent that the leases had not been encumbered by ODC.[5]

Thus the proposed Third Amended Complaint eliminates the ¶ 11(f) allegation as to Sullivan having said the Jackson and Lambert property leases were "clean" *before* Excalibur entered into the participation and operating agreements. What TAC ¶ 15(d) alleges instead is that Sullivan made that representation during a July 28, 1983 telephone conversation with Turetzky—a conversation that took place *after* Excalibur had entered into the participation and operating agreements but before Excalibur delivered money to ODC in accord with those agreements:

Sullivan responded to Turetzky during the telephone conversation that there was "no problem," that "title to the leases is clean," and that Sullivan was just behind in preparing his paperwork. Sullivan advised Turetzky that there were no title problems which would prevent Excalibur from disbursing funds to Oil Development Company.

That poses an obvious contrast to the Second Amended Complaint allegation (¶ 15(d)):

Sullivan responded to Turetzky during the telephone conversation that there was "no problem" and that Sullivan was just behind in preparing his paperwork.[6]

As for the two limited partnerships Excalibur now seeks leave to add as plaintiffs, S–1 Mem. 6 says Excalibur disclosed the existence of those partnerships only on October 3, 1986—and only after Sullivan had specifically asked whether Excalibur had made any offerings.[7] Yet Excalibur retained an attorney, Howard Gopman ("Gopman"), as early as June 24, 1983 to prepare

---

**5.** [Footnote by this Court] That "clarification" raises an obvious and disturbing Rule 11 question: What "reasonable inquiry" was the contrary allegation—a purported *direct quote* from Sullivan in ¶ 11(f) "that the leases are clean"—based on? After all, Turetzky was the only Excalibur representative at the meeting. What he later acknowledged in his deposition was, by definition, knowledge ascribable to Excalibur and its lawyers *before* this suit was filed.

**6.** [Footnote by this Court] Here too the question and observation contained in n. 5 apply with full vigor.

**7.** S–1 Mem. 6–8 charges Excalibur with purposely concealing the existence of those limited partnerships, supporting that charge with references to Excalibur's responses to discovery requests. E. Mem. does not attempt to refute the charge.

an offering memorandum for Oil & Gas 83–5 ("Memorandum 83–5") (S–2 Mem. Ex.). That memorandum is dated July 1, 1983, the same day Excalibur entered into the first participation and operating agreements with ODC (S–2 Mem. Ex.). Gopman also prepared an offering memorandum for Oil & Gas 83–6 ("Memorandum 83–6") dated August 20, 1983 (S–2 Mem. Ex.).

Each Memorandum was distributed about a week after it had been prepared (T. Dep. 51), and each limited partnership thereafter became fully subscribed. For example, 35 investors became limited partners in Oil & Gas 83–5.[8] Memorandum 83–5 provided in part (except as indicated by quotation marks, this is a paraphrase rather than a direct quotation):

1. Upon receipt and acceptance of all the fully-paid subscriptions, the limited partnership would be formed under Illinois law (pursuant to the Illinois Uniform Limited Partnership Act) by execution of the Agreement of Limited Partnership (viii and 9).

2. Excalibur and Turetzky were made the General Partners, with management and control of the Partnership business resting exclusively with them.[9] Limited partners would have no voice or part in the management or control of the Partnership and no authority to act for the Partnership (16).

3. Two investment objectives were stated: "to drill two Exploratory Wells" (Jackson # 6 and Lambert # 2) and "to provide cash distribution to its partners from the production of oil and/or gas" (viii).

4. "Excalibur has contributed or will cause to be contributed to the Partnership all of its right, title and interest to the Lease more particularly described under 'Partnership Property'" (8). "ODC will contribute or cause to be contributed to the Partnership all its right, title and interest to [the acreage to serve] as the

drilling sites" (9).[10] "ODC previously acquired a 100% interest in oil and gas leases which includes the ... drilling sites" (19).

5. Under the Operating Agreement to be entered into between the Partnership and Excalibur (12–13):

"The Operating Agreement provides that Excalibur agrees to drill and test two (2) wells ... for a turnkey price of $197,000.00.... Excalibur represents and will submit a letter to the Partnership that this is a fair price for these services and not greater than competitive comparable, arms-length arrangements. Excalibur expects to realize a profit on this turnkey price, although such profit, if any, cannot be determined in advance.

\*  \*  \*  \*  \*  \*

"If a well is completed or operated, the Partnership will do so pursuant to the Operating Agreement with Excalibur. The Operating Agreement provides that Excalibur agrees to secure and operate all the equipment needed for the completion and production of the well to be drilled on the Lease at a turnkey cost of $197,200.00 for both wells to the Partnership.

\*  \*  \*  \*  \*  \*

"Excalibur does not own drilling equipment nor does it engage in its own oil drilling or exploration. Excalibur will act as a general contractor and obtain equipment and supplies and engage subcontractors to perform the services called for under the Operating Agreement. Excalibur does have a contract' with ODC for drilling both wells at the date of this Memorandum."

In addition, the Partnership also had to pay Excalibur two other fees: (1) a management fee of $9,500 and (2) another $9,300 as organizational expenses related to the offering (15, 19, 29).

---

8. According to Memorandum 83–5, the limited partnership interests would become "units of participation in the partnerships when the partnership is activated."

9. Excalibur is also the operator under the Operating Agreement with the Partnership (page one of that Agreement).

10. This does not track the Agreement of Limited Partnership for Oil & Gas 83–5, which (at page two) refers only to Excalibur's (not ODC's) contribution of its right, title and interest. That possible disparity is nonmaterial, however.

6. "Any initial profits and losses resulting from intangible drilling costs of the Partnership shall be charged one percent (1%) to the General Partners and ninety-nine percent (99%) to the limited partners as a group" (15). If the wells were completed and operated, net profits were to be shared as follows (15):

"The total Landowner's Royalty related to the wells to be drilled on the Jackson Lease [Lambert Lease] is 16.67% [18.75%]. ODC will receive a Working Interest of 41.67% [40.63%] for which it will pay its proportionate share of drilling, testing, and completion costs. Excalibur shall receive a Carried Interest of 6.66% [5.62%]. The remaining 35% becomes the Working Interest belonging to the Partnership. This Working Interest will be divided between the General Partners and contributing Limited Partners in accordance with their Subscriptions and the Agreement of Limited Partnership."

7. Because Excalibur and Turetzky were the General Partners, the Memorandum provided (1):

*"Conflicts of Interest*
Substantially all terms of this investment and terms relating to the operation of the Partnership have been determined prior to the formation of the Partnership by the General Partners. This includes but is not limited to (1) the property to be acquired by the Partnership, (2) terms of the Operating Agreement, including the turnkey price for testing and drilling, (3) completion costs, (4) contributions of the General Partners and Limited Partners, and (5) allocation of profits and losses. These terms were not negotiated with the Partnership but were arranged by the General Partners whose interests may conflict with those of the Limited Partners, particularly with respect to amounts of compensation and allocation of profits.

The General Partners believe these terms are fair, but in light of the non-arms-length nature of these arrangements and apparent conflicts of interest, prospective investors and their advisors should carefully review and independently evaluate the terms of these arrangements."

Memorandum 83–6 contains similar provisions relating to the drilling of Lambert # 3.[11]

Turetzky testified Excalibur had in fact received from the limited partnerships the funds specified in Memorandum 83–5 and 83–6 (T. Dep. 253–58, 277–78). That included all the profit on the turnkey drilling arrangements (the spread between what ODC charged Excalibur and what Excalibur charged the limited partnerships for drilling and completing the wells).

With the limited partnerships' existence and payments to Excalibur having now been disclosed to Sullivan, E. Mem. 3 and 7 says:

It has now been determined that the corporation, in purchasing working interests from ODC was acting, not on its own behalf, but as promoter of two limited partnerships. The Jackson # 6 and Lambert # 2 participation agreements with ODC were assigned by [Excalibur] to [Oil & Gas 83–5]. The participation agreement relating to Lambert # 3 was assigned by [Excalibur] to [Oil & Gas 83–6]. . . . The funds disbursed to ODC were those of the limited partnerships, and it is the limited partnerships that were ultimately injured by Sullivan's acts which are the subject matter of this proceeding.

\* \* \* \* \* \*

The agreements [with ODC] were entered into by Excalibur Oil, Inc. in its own name. However, the corporation entered into the agreements as a promoter with the intent of assigning the agreements relating to the acquisition of working interests to the limited partnerships.

---

**11.** According to Memorandum 83–6 (S–2 Mem. Ex.), the Operating Agreement for Lambert # 3 provides (1) Excalibur will be paid a turnkey price of $118,500 for drilling and testing, (2) an additional turnkey price of $77,550 if a well is completed or operated (not payable if the drilling results in a dry hole), (3) a management fee of $5,400 and (4) $5,050 in organizational expenses.

After the agreements were signed, they were assigned to and became assets of the limited partnerships. Based on Sullivan's misrepresentation that title to the Jackson lease was clean, and advice that there was no impediment to disbursement, funds of the limited partnerships were paid to ODC. Thus, the parties ultimately injured by Sullivan's misrepresentation were the limited partnerships of which [Excalibur] was promoter and of which it is one of the general partners.

In other words, Excalibur has only now "determined" through Sullivan's discovery efforts what it purportedly intended to do, and then did, three years earlier when it entered into the agreements with ODC.

### Excalibur's Motion and Sullivan's Response

Those new "discoveries" prompted Excalibur to file a Third Amended Complaint (E. Motion ¶ 1) "to clarify the parties on whose behalf this action is brought." E. Mem. 8 explains the limited partnerships were the parties "ultimately injured" by Sullivan's alleged misrepresentation, and E. Mem. 18 says Excalibur "always intended to pay any recovery in this action to the limited partnerships." Nevertheless Excalibur asserts it properly sued in its own name under an exception to the "real party in interest" requirement of Rule 17(a),[12] because it entered into the participation and operating agreements with ODC "on behalf of" the limited partnerships (E. Motion ¶¶ 4 and 5).

S-1 Mem. opposes the filing of that new Complaint on four grounds:

1. Rule 17(a)'s exception does not apply because Excalibur entered into the agreements with ODC for its own benefit, not that of the limited partnerships.

2. Even the Third Amended Complaint does not clarify who the parties are (Excalibur and Turetzky still purport to sue as individuals as well as on behalf of the partnerships).

3. Excalibur has from the beginning attempted to conceal the formation of the limited partnerships in order to portray itself as the damaged investor.

4. Because the Third Amended Complaint raises entirely new issues of fact and law, it should not be allowed at this late date.[13]

### Sullivan's Motion

On the present pleadings, with Excalibur as the plaintiff, Sullivan seeks summary judgment on all counts because Excalibur suffered no damage from the alleged misrepresentation. S-2 Mem. reasons the limited partnerships paid Excalibur $619,500 to provide them with the same interest and turnkey services for which Excalibur paid ODC only $405,000. Thus Excalibur actually profited from the deal rather than sustaining any injury. Alternatively, if leave were granted to make the limited partnerships the real plaintiffs, Sullivan seeks summary judgment as to:

1. the claims based on the Jackson # 6 and Lambert # 2 wells, because Excalibur now admits it entered into the operating and participation agreements as to those wells before Sullivan had made any representation as to the quality of ODC's title to the land;

2. the negligence and breach of fiduciary duty claims, because Sullivan did not have an attorney-client relationship with the limited partnerships;

3. the breach of contract claim, because there was no contract between Sullivan and the limited partnerships; and

---

12. That Rule provides in part (emphasis added): Every action shall be prosecuted in the name of the real party in interest. An executor, administrator, guardian, bailee, trustee of an express trust, *a party with whom or in whose name a contract has been made for the benefit of another,* or a party authorized by statute *may sue in his own name* without joining with him the party for whose benefit the action is brought. . . .

13. Sullivan also says he will pursue third-party actions for contribution against Excalibur if the Third Amended Complaint is filed. S-1 Mem. 9-10 asserts (directly confirmed by T. Dep. 283) that Memorandum 83-5 was distributed before Sullivan's alleged misrepresentation as to the quality of title to any leases, yet the Memorandum said ODC had good title to the leases. Thus S-1 Mem. 10 reasons Excalibur, Turetzky and Gopman should be named as defendants in this action, rather than directing the litigation on behalf of the limited partnerships.

4. the claims under Section 10(b) of the 1934 Act (15 U.S.C. § 78j(b)), Section 12(2) and 17(a) of the 1933 Act (15 U.S.C. §§ 77*l*(2) and 77q(a)) and West Virginia Blue Sky Laws, because (a) the limited partnerships did not buy a security from ODC and (b) Sullivan's only possible involvement was in the sale from ODC to Excalibur.

### Allowability of the Proposed Amendments

Excalibur is more than a bit disingenuous when it says it seeks only to "clarify" its Complaint. When Excalibur initiated this action some 2½ years ago it did so in its own name, making no mention of the limited partnerships. Excalibur alleged it had been induced by Sullivan's alleged misrepresentations to enter into the participation and operating agreements with ODC and then to pay money to ODC in accordance with those agreements. Thus Excalibur sought to recover the $405,000 it had paid to ODC. Turetzky (Excalibur's President and the limited partnerships' General Partner) later testified (T. Dep. 4–5):

Q: As I understand it, Excalibur Oil, Inc. is an Illinois corporation, is that correct?

A: That is correct.

Q: And this is an action by Excalibur Oil, Inc. for losses sustained by Excalibur Oil, Inc.; is that correct?

A: That is correct.

Now—just when Sullivan has succeeded in learning about the limited partnerships' agreements with, and payments to, Excalibur (and hence of a potential ground for summary judgment)—Excalibur seeks to "clarify" its Complaint: It has apparently decided it is time to inform Sullivan and this Court that Excalibur has purportedly been suing all along to recover *for the limited partnerships* the money paid to ODC *by the limited partnerships*. Accordingly the proposed Third Amended Complaint:

1. adds the limited partnerships as plaintiffs and

2. alleges Excalibur delivered all funds to ODC "on behalf of" the limited partnerships, to which the agreements with ODC "had been assigned pursuant to [the offering memoranda]" (TAC ¶¶ 16(d) and 19(c)).[14]

Leave so to amend the Complaint must be denied.

This Court's discretion to grant or deny a motion for leave to amend the pleadings (*Knapp v. Whitaker*, 757 F.2d 827, 849 (7th Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985)) is narrowed by the Rule 15(a) directive that "leave shall be freely given when justice so requires." In exercising its discretion, this Court may consider such factors as (*Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)):

undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment....

■ Paramount among those considerations here (in influencing this Court to deny leave to amend) is the utter futility of the proposed amendments. There is absolutely nothing proffered to support Excalibur's bald assertions it (1) entered into the agreements with ODC on the limited partnerships' behalf (as a promoter or agent) with the limited partnerships' funds and (2) assigned those agreements to the limited partnerships under the offering memoranda.[15] All E. Mem. 10–11 provides in sup-

---

**14.** [Footnote by this Court] E. Mem. 12 also says (but the Third Amended Complaint does not allege):

> Excalibur Oil, Inc., as an agent for the limited partnerships as undisclosed principals, engaged Sullivan to act as an attorney. Upon creation of the partnerships, they ratified the corporation's prior act in employing Sullivan.

Apart from the creative reconstruction of history that appears to reflect (in several respects), this Court is entitled to—and does—disregard such statements external to the pleadings. *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984).

**15.** This Court is of course aware that what is involved here is a proposed pleading, as to which the normal rule for testing its sufficiency

port of those allegations is case law tending to show Excalibur *could have* done all those things acting as the limited partnerships' promoter or agent.[16]

Examination of the offering memoranda reveals a wholly different scenario: Excalibur entered into the agreements with ODC on its *own* behalf and never assigned them to the limited partnerships. Indeed, had Excalibur simply assigned (that is, turned over) its contracts with ODC to the limited partnerships, Excalibur would have had no residual interest in the wells to contribute to those partnerships. Even more, Excalibur certainly would not have been enabled to contract with the limited partnerships to deliver the wells on a turnkey basis at the vastly higher price of $619,500. Instead the limited partnerships would have already obtained the contracts—the enforceable right—to acquire that interest and those services from ODC at a cost of only $405,000. That being so, S.R. Mem. 3–4 (footnote omitted, emphasis in original) aptly describes Excalibur's transactions with the limited partnerships:

> The fact of the matter is that Excalibur never assigned its *contracts* to acquire working interests to the partnerships. The only assignments by Excalibur were of its working interests which were made at a cost of $214,500 over the contract price of the contracts Excalibur says it assigned to the partnerships.
>
> * * * * * *
>
> Clearly, Excalibur did not enter into its contracts with [ODC] for the benefit of

the partnerships, nor did it assign those contracts to the partnerships. Excalibur entered into those contracts for its own benefit—i.e., to fulfill its own, direct drilling obligations to the partnerships as general contractor and at a cost that would ensure a large profit to itself. The partnerships did not pay [ODC] for work performed. They paid Excalibur. Excalibur in turn paid [ODC] pursuant to its contract obligations with [ODC].

Because there is no doubt that Excalibur (1) acted in its own behalf in entering into agreements with ODC (as well as in arranging with Sullivan to prepare title opinions) and (2) did not assign those agreements to the limited partnerships, this Court finds the proposed addition of the limited partnerships as plaintiffs would be "futile" in the sense intended by *Foman.* Excalibur identifies three proposed bases for the limited partnerships' claims against Sullivan:

1. Excalibur, acting as an agent for undisclosed principals (the limited partnerships), engaged Sullivan to act as its attorney and the limited partnerships later ratified Excalibur's act, thus making Sullivan the limited partnerships' attorney (E. Mem. at 12).

2. Both limited partnerships were third-party beneficiaries of the employment contract between Excalibur and Sullivan (*id.* at 14–15).

3. Excalibur assigned the agreements with ODC to the limited partnerships, so the partnerships "necessarily succeeded

---

is to accept all well-pleaded allegations as true. But here the litigants are well over two years into the litigation, with extensive discovery behind them. Even more to the point, the matters Excalibur and the putative new plaintiffs now seek to advance are all within their *own* knowledge—no discovery from Sullivan was needed. Where such late-tendered and dramatic changes in alleged facts are involved, the required satisfaction of Rule 15(a) (not to mention the Rule 11 obligation imposed on Excalibur's counsel) mandates a factual showing to support the proposed new allegations as a precondition to Excalibur's obtaining leave to amend.

**16.** E. Mem. 11 cites authority in support of two propositions:

1. Any contract made by a promoter of a corporation on its behalf may be adopted,

accepted or ratified by the corporation when organized, and the corporation is then liable on the contract itself (Fletcher, *Cyclopedia of the Law of Private Corporations* § 207 (1974)).

2. Although an agent has no authority at the time he makes an offer to act on behalf of a nonexistent corporation, as soon as the new corporation is created it may accept the offer and by so doing ratify and adopt the action of the unauthorized agent (*Interstate Folding Box Co. v. La Mode G. Mfg. Co.,* 301 Ill.App. 283, 288–89, 22 N.E.2d 769, 771–72 (1st Dist.1939)). Those principles are wholly inapposite here, because on the facts disclosed by Excalibur itself it dealt at arms' length with the limited partnerships—they never adopted, accepted or ratified Excalibur's agreements with ODC as their own.

to the rights for attorney malpractice which induced consummation of those agreements" (*id.* at 16).

For the reasons already explained, each of those notions rests on the same false premises that Excalibur entered into the agreements with ODC (and Sullivan) as the limited partnerships' agent and that the limited partnerships later ratified those agreements, thereby becoming parties to the agreements.

With the underlying premises rejected, Excalibur's proposed conclusions from those premises fail as well. S-2 Mem. is entirely correct in urging the limited partnerships:

1. did not hire Sullivan to act as their attorney, nor were they the intended beneficiaries of Excalibur's alleged employment contract with Sullivan;

2. did not contract with Sullivan for the preparation of title opinions, nor were they the intended beneficiaries of Excalibur's contract with Sullivan to provide such opinions; and

3. did not purchase securities from ODC in reliance on Sullivan's alleged misrepresentation.

Accordingly Sullivan may not be held liable to the limited partnerships (at least under any theory Excalibur has proffered) for negligence, breach of fiduciary duty, breach of contract or violations of federal or state securities laws.

■ Even aside from the futility of the proposed amendments, Excalibur is guilty of undue and inexcusable delay in seeking leave to amend. It has inexplicably waited over two years to attempt to amend its Complaint to add the limited partnerships as parties and to inform Sullivan and this Court that the limited partnerships (and not Excalibur acting for its own account) paid money to ODC in reliance on Sullivan's alleged misrepresentation.

Yet Excalibur has provided not a single attempted justification for its delay. As the limited partnerships' General Partner, Excalibur certainly knew—*before* it filed this action—everything it now asserts and proposes to allege in the Third Amended Complaint as the basis for the limited partnerships' claims. Under such circumstanc-

es Rule 15(a)'s purpose would not be served by permitting Excalibur's proposed amendments, for as 6 Wright & Miller, *Federal Practice and Procedure: Civil* § 1473, at 375 (1971) explains:

The function of Rule 15(a) ... is to enable a party to assert matters that were overlooked or were unknown to him at the time he interposed his original complaint or answer.

In sum, this Court finds no justification for burdening Sullivan at this late date with having to defend against such new and futile claims by the limited partnerships. Leave to file the Third Amended Complaint is denied.

### Summary Judgment on the Present Claims

■ That leaves for resolution Sullivan's motion for summary judgment as to Excalibur's claims. Sullivan reasons Excalibur suffered no damages from relying on his alleged misrepresentation because it was able to sell to the limited partnerships for $619,500 (less expenses) what it had purchased from ODC for $405,000.

Turetzky has confirmed Excalibur actually profited from its purchases from ODC. He said as to the Jackson # 6 and Lambert # 2 wells (T. Dep. 255–56):

Q: So, am I correct that Excalibur Oil, Inc. paid out to [ODC] the sum of two hundred seventy thousand dollars, which represents one hundred sixty thousand dollars plus a hundred and ten thousand dollars, is that correct?

A: Yes.

Q: And it received a hundred and ninety-seven thousand dollars for drilling and testing the two wells and it received a management fee of $9,500 and it received a completion of $197,200 and it received an organizational expense of $9,300 on these two wells, which I believe adds up to four hundred thirteen thousand dollars. Does that sound right?

\*  \*  \*  \*  \*  \*

Q: Those [management and organizational expense] fees are totally separate

from the hundred and ninety-seven thousand, aren't they?

A: Yes.

\* \* \* \* \* \*

Q: Excalibur Oil, Inc. received four hundred thirteen thousand dollars, not counting whatever percentage of revenues it might have received from production, is that correct?

A: Yes.

Q: And it paid out two hundred seventy thousand dollars, right?

A: For drilling and testing and completion, yes.[17]

As for the Lambert # 3 well, Turetzky similarly testified (T. Dep. 277–78):

Q: Showing you Page 13 of Exhibit 4, being the private placement memo for [Oil & Gas 83–6], Excalibur Oil, Inc. paid to itself the drilling and testing fee of $118,500, correct?

A: Yes.

Q: And it paid to itself a management fee of fifty-four hundred dollars, correct?

A: Yes.

Q: And it paid to itself a completion fee of $77,550, is that correct?

A: Yes.

\* \* \* \* \* \*

Q: And it paid to itself an organizational expense of five thousand fifty dollars, is that correct?

A: Yes.

Q: And that adds up to $206,500, correct?

A: Yes.

Q: And it paid out to [ODC] the sum of a hundred and [thirty-five] thousand.

A: Yes.

Q: So, it paid to itself in excess of what it paid to [ODC] $71,500, correct?

A: Correct.

Excalibur makes no attempt to show it nonetheless suffered injury from its purchase from ODC. Instead E. Mem. 19 elects to put all its eggs in one basket, responding:

Defendant's Motion for Summary Judgment argues that there was no damage to the corporation itself. As set forth above, it is clear that this cause is brought on behalf of the limited partnerships which have been damaged by the amount paid by them to ODC in reliance on Sullivan's false representation. It is the injury incurred by the limited partnerships, not the corporate promoter and general partner, which is at issue.[18]

Based on its review of Turetzky's testimony and the other documents supplied by the parties, this Court finds it undisputed that Excalibur suffered no damages from Sullivan's alleged misrepresentation.[19] Sullivan's motion for summary judgment is granted as to all counts in the Complaint.

### Rule 11

■ S–2 Mem. 18 prays for relief under Rule 11 in the form of all costs, expenses and attorneys' fees paid from the com-

---

**17.** [Footnote by this Court] Turetzky also testified as to some expenses Excalibur had incurred (T. Dep. 258–61): $12,390 in legal fees to form Oil & Gas 83–5; $1,000 to $1,500 for printing and binding Memorandum 83–5; not more than $5,000 in accounting fees for setting up the books; $400 per year for preparation of K–1s; and expenses for trips to the field. Turetzky conceded the total expenses certainly did not exceed the difference ($143,000) between what Excalibur was paid by Oil & Gas 83–5 and what it paid to ODC (*id.* at 261).

**18.** [Footnote by this Court] E. Mem. indicates (in its attached "Affidavit and Statement Pursuant to Rule 12(f)....") that Excalibur may not have profited by as much as Sullivan asserts (¶ 28):

Since suit is brought on behalf of the limited partnerships, receipts and disbursements of Excalibur Oil, Inc. are not relevant to the issues in this case. That corporation has, in fact, incurred substantial transportation, lodging, legal and other expenses in connection with the agreements to purchase working interests in the Jackson and Lambert wells. In addition that corporation drilled another well which was a "dry hole."

That does not suffice to create a genuine issue of material fact for Rule 56 purposes.

**19.** Having decided the motion on that ground, this opinion need not address Sullivan's alternative ground for (partial) summary judgment: the contention that Excalibur entered into the agreements with ODC as to Jackson # 6 and Lambert # 3 *before* Sullivan's alleged misrepresentation. Nor is it necessary to analyze the various counterarguments that approach would generate on both sides.

mencement of this action to its conclusion. Sullivan may very well be entitled to that relief. It appears Excalibur may have had no reasonable basis:

  1. for making at least two critical allegations in the Complaint:

  (a) "By reason of said negligent statements made by Sullivan to Excalibur, Excalibur has been damaged in an amount in excess of $405,000" (¶ 27); and

  (b) on May 24, 1983 Sullivan told Turetzky certain leases were free and clear of claims, liens and encumbrances (¶ 11(b)); and

  2. for moving to amend the Complaint to allege Excalibur delivered all funds to ODC "on behalf of" the limited partnerships, to which the agreements with ODC "had been assigned pursuant to [the offering memoranda]" (TAC ¶¶ 16(d) and 19(c)).

It also appears from Sullivan's submissions that Excalibur may well have intentionally concealed from Sullivan information about the limited partnerships that he had requested in discovery.

However, Excalibur and its counsel really have not addressed themselves to Sullivan's Rule 11 motion. They are granted leave to do so on or before May 22, 1987, after which this Court will advise the parties as to any further procedures.

### Conclusion

Excalibur's motion for leave to file the Third Amended Complaint is denied. There is no genuine issue of material fact as to the claims now asserted by Excalibur, and Sullivan is entitled to a judgment as a matter of law. This action is dismissed.[20]

---

**20.** This is intended to be a final order, unaffected by the pendency of the collateral Rule 11 issue of fees and expenses. To avoid any doubt on that score (though there should be none), this Court expressly determines there is no just reason for delay and expressly directs the entry of a final judgment of dismissal in Sullivan's favor (see Rule 54(b), though it is not literally applicable here).