

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-12-1998

# Klein v. Boyd

Precedential or Non-Precedential:

Docket 97-1143,97-1261

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Klein v. Boyd" (1998). *1998 Decisions.* Paper 28.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/28

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 12, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 97-1143 and 97-1261

ELYSE S. KLEIN; RICHARD KASTNER; DORIS KASTNER;
WARREN KASTNER,

      Appellants in No. 97-1143

v.

WILLIAM BALLANTINE BOYD, III; WILLIAM DISSTON
COLEMAN; THOMAS H. TARANTINO; LAWRENCE G.
STEVENS; GREGORY JAMGOCHIAN; DRINKER, BIDDLE
& REATH; MERCER SECURITIES, INC.; MERCER
SECURITIES, LTD.

ELYSE S. KLEIN; RICHARD KASTNER; DORIS KASTNER;
WARREN KASTNER,

      Appellants in No. 97-1261

v.

WILLIAM BALLANTINE BOYD, III; WILLIAM DISSTON
COLEMAN; THOMAS H. TARANTINO; LAWRENCE G.
STEVENS; GREGORY JAMGOCHIAN; DRINKER, BIDDLE
& REATH; MERCER SECURITIES, INC.; MERCER
SECURITIES, LTD.

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 95-cv-05410)

ARGUED
September 9, 1997

Before: MANSMANN and NYGAARD, Circuit Judges, and
BLOCH, District Judge.*

(Filed February 12, 1998)

Bruce S. Marks, Esquire (ARGUED)
Spector, Gadon & Rosen
1700 Market Street
29th Floor
Philadelphia, Pennsylvania 19103

 COUNSEL FOR APPELLANTS

Jon A. Baughman, Esquire
 (ARGUED)
Michael A. Freeman, Esquire
Pepper, Hamilton & Scheetz
18th & Arch Streets
3000 Two Logan Square
Philadelphia, Pennsylvania 19103-
 2799

 COUNSEL FOR APPELLEE
 DRINKER, BIDDLE & REATH

OPINION OF THE COURT

MANSMANN, Circuit Judge.

After a limited partnership failed, four investors in the
partnership brought suit against the partnership, the
corporate general partner, officers of the general partner,
employees of the partnership, and the law firm that
represented the partnership. The investors asserted causes
of action under section 10(b) of the Securities Exchange Act
of 1934, 15 U.S.C. S 78j(b), and companion Rule 10b-5, 17
_____

*Honorable Alan N. Bloch of the United States District Court for the
Western District of Pennsylvania, sitting by designation.

2

C.F.R. S 240.10b-5, section 1962 of the Racketeer
Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.
S 1962, and common law fraud. The investors later
attempted to amend their complaint to assert causes of
action for failure to disclose material information under the
Massachusetts Uniform Securities Act, Mass. Gen. Laws ch.
110A, S 101 et seq., and the Pennsylvania Securities Act of
1972, Pa. Stat. Ann. tit. 70, S 1-101 et seq., and for fraud
in violation of the Massachusetts Consumer Protection Act,
Mass. Gen. Laws ch. 93A, S 1 et seq., and the Pennsylvania
Unfair Trade Practices and Consumer Protection Law, Pa.
Stat. Ann. tit. 73, S 201-1 et seq.

The law firm and the other defendants opposed the
motion to amend, and they filed motions for summary
judgment. The district court denied the investors' motion to
amend as to the law firm, and it granted the firm's motion
for summary judgment in its entirety. Subsequently, the
remaining defendants settled with the investors.

The investors appealed from the district court'sfinal
order granting the law firm's motion for summary judgment
and denying the investors' motion for leave to amend. We
agree with the district court that the federal securities
claim of one of the investors is barred by the statute of
limitations. As to the remaining investors, however, we
disagree with the district court's disposition of the federal
securities claim and conclude that the investors have
proffered sufficient evidence to establish a genuine issue of
material fact as to (1) whether the law firm made a
statement containing a material omission upon which the
investors relied, and (2) whether the law firm acted with
scienter. In so concluding, we hold that a lawyer who can
fairly be characterized as an author or a co-author of a
client's fraudulent document may be held primarily liable to
a third-party investor under the federal securities laws for
the material misstatements or omissions contained in the
document, even when the lawyer did not sign or endorse
the document and the investor is therefore unaware of the
lawyer's role in the fraud.1 We will reverse the judgment of

_____

1. We later set forth the following specific requirements to hold such a
lawyer liable: (1) the lawyer knows (or is reckless in not knowing) that

3

the district court insofar as it granted the law firm's motion
for summary judgment on the federal securities claim as to
three of the four investors. Similarly, we will reverse the
judgment of the district court on the investors' common law
fraud claim, which claim was timely as to all four investors.

As to the investors' RICO claims, we conclude that the
law firm did not participate in the operation or management
of the purported enterprise and cannot, therefore, be liable
under 18 U.S.C. S 1962(c). Consequently, the law firm
cannot be liable, under 18 U.S.C. S 1962(d), for conspiracy
to violate section 1962(c). We hold that there is no private
cause of action for aiding and abetting a RICO violation. We
will, therefore, affirm the judgment of the district court
insofar as it granted the law firm's motion for summary
judgment on the investors' RICO claims, although we do so
for reasons different from those offered by the district court.

Finally, we will affirm the district court's order denying
the investors' motion for leave to further amend their
complaint, as the proposed amendments would not survive
a renewed motion to dismiss. The investors may not pursue
a claim against the law firm under the Pennsylvania Unfair
Trade Practices and Consumer Protection Law because
securities are not "goods" under that law. The investors
may not pursue a claim against the law firm under the
Massachusetts Consumer Protection Act because the
investors did not have a "business relationship" with the
firm. The investors may not pursue a claim against the law
firm under either the Pennsylvania Securities Act or the
Massachusetts Securities Act because the firm was not a
statutory "agent" of the limited partnership.
_____

the statement will be relied upon by investors, (2) the lawyer is aware
(or
is reckless in not being aware) of the material misstatement or omission,
(3) the lawyer played such a substantial role in the creation of the
statement that the lawyer could fairly be said to be the "author" or "co-
author" of the statement, and (4) the other requirements of primary
liability are satisfied.

I.2

William Coleman has a long record of securities fraud, regulatory sanction, and customer claims of fraudulent conduct dating back to 1981. He was censured by the Chicago Board of Options in 1987 for unauthorized trading. He entered into a consent order with the states of Vermont and Minnesota which barred him from certain broker-dealer positions. He was prohibited from soliciting clients pursuant to agreements with the National Association of Securities Dealers ("NASD"). Numerous complaints were brought against Coleman by investors, including claims of fraud, unauthorized option trading, and churning; many of these claims were settled at or near the full amount of the claim.

Since 1990, Coleman had been the stock broker and financial adviser for Pennsylvania resident Elyse Klein. Richard and Doris Kastner, Elyse's parents and residents of Pennsylvania, retained Coleman as their broker in 1990 or 1991. Warren Kastner, Richard's brother and a resident of Massachusetts, also retained Coleman as his broker in 1990 or 1991.3 These investors were not aware of Coleman's record.

In 1992, Coleman and Thomas Tarantino joined to purchase the securities brokerage business of Edward C. Rorer & Co. Tarantino recommended retaining Drinker Biddle & Reath ("Drinker"), a Philadelphia law firm, to provide legal advice and to assist in the formation of the new business entity. Robert Strouse, a partner at Drinker, assumed primary responsibility for the matter. Strouse asked Paula Calhoun, a junior associate at Drinker, to assist him.

_____

2. Because we are reviewing the grant of the law firm's motion for summary judgment, we must view the facts in the light most favorable to the investors. Thus, the investors' evidence is to be believed, and all justifiable inferences are to be drawn in their favor. Kline v. First W. Gov't
Sec., Inc., 24 F.3d 480, 481-82 (3d Cir. 1994).

3. We will refer to Elyse Klein, Richard Kastner, Doris Kastner, and Warren Kastner individually by first name or collectively as "the investors."

In September 1992, Strouse met with Coleman and Tarantino to discuss the transaction. Coleman and Tarantino explained the concept of the new business they were forming and the terms of the agreement they wanted Drinker to prepare. They explained that Mercer Securities, Ltd. ("Mercer LP") was to purchase Rorer's business. Mercer LP was to be organized as a limited partnership with a corporate general partner, Mercer Securities, Inc. ("Mercer, Inc.").

Coleman and Tarantino explained that Mercer, Inc. was already in existence, and that Coleman owned 60% of its stock, Tarantino owned 30%, and William Boyd owned 10%. Boyd became president of Mercer, Inc. and would be the "financial principal" of Mercer LP. Strouse also learned that broker Steven Schappell was to join Mercer LP and would play an important role in the firm's financial success.

Near the end of the September meeting, Coleman and Tarantino set up a conference call with Richard and Warren, whom Strouse was told were going to be investors in Mercer LP, and discussed with them the terms of the investment. After the meeting, Strouse learned that Elyse was also going to invest in Mercer LP based on similar representations made by Coleman.

After the meeting, Strouse learned from Tarantino that Mercer LP, without waiting for Drinker to draft the partnership and subscription agreement or the necessary disclosure documents, had begun operations. Strouse learned that Coleman had already solicited and received $50,000 from Elyse, $100,000 from Richard and Doris, and $100,000 from Warren. Coleman had told the investors that they would face little risk and that they would receive a 25% annual return. When Strouse learned that Mercer LP had received these investments without providing written disclosures, he advised that the partnership agreement be completed, that a disclosure letter be provided to the investors, and that the investors be given an opportunity to reaffirm or rescind their investments.

Strouse did not learn that Coleman had a history of securities violations and customer complaints until after the September meeting. According to the investors, in

6

November or December 1992, Tarantino told Strouse that Coleman had concealed the full extent of his compliance history from Tarantino (and presumably from the investors as well). Strouse also learned that Boyd had a history of unemployment and was censured for permitting the subordinated debt of a prior law firm which failed to exceed the appropriate level in 1989.

By January 1993, the partnership agreement was still not completed, the investors had not received any disclosures, and the investors were not given an opportunity to reaffirm or rescind their investments. Mercer LP repaid the investors one quarter of their investment, purportedly as interest. That month, Strouse reiterated the need to complete the partnership and disclosure documents.

In February 1993, Drinker finally completed the partnership agreement and a subscription agreement, and put together a disclosure package which included a disclosure letter, U-4 Forms for Coleman and Boyd reflecting their compliance history, and other documents describing the various state supervisory orders and judgments entered against Coleman. The disclosure letter explained, inter alia, Coleman's compliance history and the fact that the NASD had substantially restricted Coleman's conduct as a broker. On February 5, 1993, Strouse and Calhoun gave Coleman and Tarantino the "February Disclosure Package" and instructed them that they needed to deliver it to the investors and obtain necessary signatures.

In May 1993, Boyd called a meeting of Mercer, Inc.'s directors. Strouse participated by telephone. Boyd stated that the February Disclosure Package had not been delivered to the investors. Strouse advised that the package should be delivered and that all necessary signatures should be obtained. Coleman and Tarantino balked at Strouse's suggestion. The February Disclosure Package was never delivered to the investors. The evidence of record does not contain any suggestion that Strouse ever had any reason to believe otherwise.

From February 1993 through June 1993, numerous orders and restrictions were entered against Coleman,

including Virginia and West Virginia orders imposing supervisory restrictions on Coleman, a California order barring Coleman from holding any position as a broker-dealer or investment advisor for four years, a Minnesota order barring Coleman from registration as a representative for five years, and an Oregon order barring Coleman from registration as an agent. During the same time period, Maryland, West Virginia, Virginia, California, Minnesota, and Oregon imposed supervisory restrictions on Mercer LP. Strouse learned of these orders no later than August 1993.

In addition, Florida refused to register Mercer LP because of Coleman's involvement. By August 1993, Strouse knew that, although Mercer LP was not registered in Florida, Mercer LP had transacted $1.8 million in that state. Also by August 1993, Strouse was aware that Schappell had once pled guilty to possession of cocaine.

On July 7, 1993, following a dispute with Coleman, Tarantino was ousted as director and officer of Mercer, Inc.

In August 1993, Boyd asked Drinker to prepare a form letter that Mercer LP could use to repurchase a limited partnership interest. Calhoun drafted the letter and sent it to Boyd, who adapted the letter and used it to repurchase the 1992 investments of Richard, Doris and Warren.

In August 1993, Coleman persuaded Elyse, who may have been in Massachusetts at the time, to invest an additional $200,000 in Mercer LP on different terms. Coleman assured Elyse that there would be no risk. At this time, Coleman owned 60% of the shares of Mercer, Inc. and a substantial portion of the limited partnership units of Mercer LP.

Mercer LP came to understand that it would not be permitted to register to do business as a broker-dealer in certain states while Coleman was a part owner. In August 1993, Coleman sold his interest in Mercer LP to his mother.

In September 1993, Coleman solicited Richard and Doris to reinvest their $100,000 on different terms. Coleman owned 60% of the shares of Mercer, Inc. at this time.

Strouse advised Mercer LP that a new partnership agreement, subscription agreement and disclosure letter

8

should be prepared to reflect recent changes. In September 1993, Drinker prepared an amended limited partnership agreement reflecting the new 1993 investments. Drinker gave the amended agreement to Coleman, who arranged to have it signed by Elyse, Richard and Doris.

In October 1993, Coleman sold his 60% interest in Mercer, Inc. to Mercer LP brokers Gregory Jamgochian and Lawrence Stevens. Coleman divested his interest in Mercer, Inc. because state securities regulators refused to give Mercer LP permission to operate in Florida so long as Coleman had an interest in the company.

In October or November 1993, Drinker prepared a disclosure package for distribution to Elyse, Richard and Doris. The so-called "November Disclosure Package" did not contain any information about Coleman's checkered compliance history and current restrictions. The package did not contain any information about disciplinary actions taken against Boyd. The package did not contain any information about the significant restrictions placed on Mercer LP or the partnership's precarious financial position. The package did not contain any information about Schappell's drug conviction.

Boyd forwarded the November Disclosure Package to Elyse, Richard and Doris in November 1993, who confirmed their 1993 investments and acknowledged that they had received and reviewed the materials provided in the package. After all the documents had been signed and returned to Boyd, he sent them to Calhoun. Calhoun then sent a complete set of the executed partnership documents to the investors with a one-line cover memo stating, "Enclosed for your records is an original set of partnership documents." This is the only direct communication from Drinker to the investors.

In late 1993 and early 1994, Mercer LP fell below its net capital requirements. In an effort to keep the partnership afloat, Mercer LP failed to pay its brokers their full commissions.

In May 1994, Mercer LP repurchased Elyse's original $50,000 investment. At about the same time, Mercer LP offered Warren the opportunity to invest $100,000 in a

Mercer LP subordinate debenture. Warren received a disclosure letter prepared with Strouse's assistance. The "May Disclosure Letter" contained the same omissions as the November Disclosure Package. The letter also failed to disclose the partnership's recent financial problems relating to the non-payment of commissions. Warren accepted the offer by executing the loan agreement in Massachusetts; the debenture was not, however, ever recorded in Massachusetts.

In June 1994, Elyse, who by this time had become concerned over her investments with Mercer LP, consulted with attorney Barbara Podell in an attempt to recover her funds. Podell contacted the NASD, who sent her information on Coleman's compliance history. Elyse learned of Coleman's compliance history no later than the fall of 1994.

In December 1994, Schappell was killed by a bus. It was soon discovered that Schappell had severely and fraudulently mishandled some of his customers' accounts. Strouse was advised of the situation. At a meeting of the board of directors of Mercer, Inc., Strouse advised that the board not discuss the Schappell matter with anyone. Subsequently, Boyd sent the investors letters stating that Mercer LP faced problems because of Schappell's "untimely" death; the letters did not reveal the fraudulent conduct in which he engaged.

In February 1995, Mercer LP failed. The investors lost their entire $400,000 investment ($200,000 from Elyse, $100,000 from Richard and Doris, and $100,000 from Warren).

On August 23, 1995, the investors sued Mercer, Inc., Mercer LP, Boyd and Coleman. During discovery, the investors served subpoenas on Drinker and Tarantino. Among the documents produced in response to these subpoenas was the February Disclosure Package. This was the first time the investors had ever been aware of the package. On December 4, 1995, the investors filed their first amended complaint which asserted claims against Drinker, Tarantino, Jamgochian, and Stevens.

10

The investors' complaint against Drinker included claims for securities fraud under section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, violation of RICO, and common law fraud, all arising from Drinker's involvement in the preparation of the November Disclosure Package and the May Disclosure Letter. The investors later attempted to amend further their amended complaint to assert claims against Drinker for failure to disclose material information under the Massachusetts Securities Act and the Pennsylvania Securities Act, and for fraud in violation of the Massachusetts Consumer Protection Act and the Pennsylvania Unfair Trade Practices and Consumer Protection Law. The district court denied the investors' motion to amend as futile.

The district court granted Drinker's motion for summary judgment on all counts. Subsequently, the investors settled with the remaining defendants. The investors appealed from the final order of the district court granting Drinker's motion for summary judgment on the securities act claim, the RICO claim, and the common law fraud claim, and also appealed from the district court's order denying the investor's motion to amend.[4]

II.

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. S 78j(b), forbids "manipulative or deceptive acts in connection with the purchase or sale of securities." Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 173 (1994); Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 473-74 (1977). Rule 10b-5, promulgated by the Securities and Exchange Commission under section 10(b), makes it unlawful for "any person,

_____

[4]. The district court had jurisdiction over the investors' federal securities
claims pursuant to 15 U.S.C. S 78aa and 28 U.S.C. S 1331. The court had jurisdiction over the investors' RICO claims pursuant to 18 U.S.C. S 1964(c) and 28 U.S.C. S 1331. The court had supplemental jurisdiction over the investors' state law claims pursuant to 28 U.S.C. S 1367. Pursuant to 28 U.S.C. S 1291, we have jurisdiction over the consolidated appeals from the final judgments of the district court entered on February 21, 1997 and March 17, 1997.

11

directly or indirectly . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. S 240.10b-5(b). Although section 10(b) and Rule 10b-5 do not explicitly provide a private right of action, the courts have inferred one. Scattergood v. Perelman, 945 F.2d 618, 622 (3d Cir. 1991); see also Central Bank of Denver, 511 U.S. at 166, 171.

To state a claim under section 10(b) and Rule 10b-5, a private plaintiff must allege that the defendant (1) with scienter (2) made misleading statements or omissions (3) of material fact (4) in connection with the purchase or sale of securities (5) upon which the plaintiff relied in entering the transaction and (6) that the plaintiff suffered economic loss as a proximate result. Scattergood, 945 F.2d at 622; In re Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1244 (3d Cir. 1989).

A.

The district court dismissed Elyse's federal securities fraud claim against Drinker because it found that the claim was barred by the statute of limitations. An action under section 10(b) and Rule 10b-5 "must be commenced within one year after the discovery of facts constituting the violation and within three years after such violation." Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364 (1991).

The one-year limitation period begins to run when the victim is placed on so-called "inquiry notice" -- when the victim should have discovered the misrepresentation or omission through the exercise of reasonable diligence. Great Rivers Coop. of Southeastern Iowa v. Farmland Indus., Inc., 120 F.3d 893, 896 (8th Cir. 1997). Inquiry notice exists "when the victim is aware of facts that would lead a reasonable person to investigate and consequently acquire actual knowledge of the defendant's misrepresentations." Id. The Court of Appeals for the Eighth Circuit recently explained the proper standard for determining when a person is on inquiry notice:

12

> [A] court must determine: (1) the facts of which the victim was aware; (2) whether a reasonable person with knowledge of those facts would have investigated the situation further; and (3) upon investigation, whether the reasonable person would have acquired actual notice of the defendant's misrepresentations. If a reasonable person aware of the facts known to the victim would have investigated, that is, exercised reasonable diligence, and consequently discovered the misrepresentations, the victim had inquiry notice.

Id. We agree with and adopt this definition of "inquiry notice."

The following facts are not in dispute: (1) Elyse's claim against Drinker is largely premised on Drinker's failure to include information on Coleman's compliance history in the November Disclosure Package; (2) Elyse learned about Coleman's compliance history no later than the fall of 1994; (3) Elyse knew that Drinker represented Mercer LP in the fall of 1994; (4) Elyse did not file suit against Drinker until December 4, 1995 -- more than one year after she had notice of Coleman's history and Drinker's representation of Mercer LP. The district court concluded that Elyse was on inquiry notice of Drinker's alleged fraudulent conduct more than one year prior to the initiation of the lawsuit against Drinker, and it held that Elyse's federal securities claim was therefore barred as to Drinker.

We agree with the district court. Elyse was placed on inquiry notice in the fall of 1994 when she learned of both Coleman's compliance history and Drinker's representation of Mercer LP. At that time, a reasonable person would have investigated and would have soon acquired actual knowledge of Drinker's role in the alleged misrepresentations.

Elyse contends that she had no basis to believe that Drinker knew of Coleman's compliance history until after she filed suit against the other defendants and obtained the February Disclosure Package during discovery. We do not dispute that Elyse might not have had actual knowledge about Drinker's alleged role until receiving the February Disclosure Package. At issue, however, is whether Elyse

13

should have investigated in the fall of 1994. We conclude that a reasonable person in Elyse's position would have investigated at that time. As a result, we will affirm the judgment of the district court insofar as it dismissed Elyse's federal securities claim against Drinker.5

B.

The district court also concluded that Drinker could not be liable to any of the investors under section 10(b) and Rule 10b-5 for the alleged omissions because Drinker never signed the documents it prepared regarding the investments and its name did not appear on any of the relevant Mercer LP documents. Since the investors were not aware of Drinker's involvement in the preparation of the disclosure documents, the district court reasoned, Drinker did not make any statements upon which the investors relied.

The district court explained that a duty to disclose under section 10(b) and Rule 10b-5 arises from the existence of a fiduciary relationship. Klein v. Boyd, No. 95-5410, 1996 WL 675554, at *27 (E.D. Pa. November 19, 1996) (citing Dirks v. SEC, 463 U.S. 646, 654 (1983)). Reasoning that the investors were not in a fiduciary relationship with Drinker, the district court concluded that Drinker did not have a duty to disclose information to the investors. Absent a duty to disclose, the court reasoned, there can be no liability for failure to disclose a material fact.

In Central Bank of Denver, the Supreme Court held that since the text of section 10(b) does not itself reach those who aid and abet a section 10(b) violation, a private plaintiff may not maintain an aiding and abetting action under section 10(b). Central Bank of Denver, 511 U.S. at 177, 191. According to the Court, section 10(b) "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act. . . . The proscription does not include giving aid to a person who commits a manipulative or deceptive act." Id. at 177.

_____

5. The district court found a genuine issue of material fact on the question of whether Richard and Doris were also placed on inquiry notice more than one year before filing suit against Drinker.

14

Although refusing to recognize a private cause of action for aiding and abetting liability, the Court acknowledged that secondary actors in the securities markets may still be liable under the securities acts:

> The absence of S 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming all the requirements for primary liability under Rule 10b-5 are met.

Id. at 191 (emphasis omitted).

Several courts since Central Bank of Denver have attempted to demarcate a boundary between actions that would only amount to aiding and abetting and actions that rise to the level of a primary violation of section 10(b). See, e.g., Anixter v. Home-Stake Prod. Co., 77 F.3d 1215 (10th Cir. 1996); In re Software Toolworks Inc. Sec. Litig., 50 F.3d 615 (9th Cir. 1994). Our inquiry requires us to investigate what it means for a secondary actor to make a materially misleading statement. In so doing, we hope to clarify circumstances under which a statement may fairly be said to have been "made" by a secondary actor.

After Central Bank of Denver, it is reasonably clear that secondary actors such as lawyers can be held primarily liable for the misrepresentations and omissions contained in disclosure documents and other statements released to investors under the secondary actors' own names, assuming the other requirements for liability are met. For example, in Kline v. First W. Gov't Sec., Inc., 24 F.3d 480 (3d Cir. 1994), a law firm issued three opinion letters concerning the tax consequences of an investment in forward contracts through First Western. Although the letters stated that they were for the exclusive use of First Western, the law firm was aware that its opinion letters had reached potential investors. Id. at 483. The investors alleged that the opinion letters, upon which they relied in

15

deciding to invest, omitted material facts concerning the structure of the First Western transactions.

The district court granted the law firm's motion for summary judgment on the investors' claim. The court reasoned that lawyers cannot be held liable for omissions in an opinion letter unless the investors can demonstrate that the lawyers had a duty to disclose the information that was omitted. Finding no evidence of a fiduciary or other relationship which would give rise to such a duty, the district court held that the investors could not proceed with their omissions claim. Id. at 490.

We reversed. We noted: "We are dealing here with a situation in which [the law firm], by authoring its opinion letters, has elected to speak regarding the transactions at issue. Plaintiffs allege that this speech was misleading because [the law firm] failed to include in its opinion letters information that, if included, would have undermined the conclusions reached in those letters." Id. We concluded that once a law firm has chosen to speak, it may not omit facts material to its non-confidential opinions. Id. at 490-91.

We reasoned that the law firm's duty to not omit material facts did not arise from a fiduciary duty owed to the investors; rather, the duty arose when the law firm undertook the affirmative act of communicating with the investors:

> [W]hen a professional undertakes the affirmative act of communicating or disseminating information, there is a general obligation or `duty' to speak truthfully . . . . And encompassed within that general obligation is also an obligation or `duty' to communicate any additional or qualifying information, then known, the absence of which would render misleading that which was communicated. . . . [This duty] is simply one facet of the general obligation to speak truthfully, arising out of and because of an affirmative act by the defendant in communicating.

Id. at 491 (quotations omitted). Summary judgment was inappropriate even though the law firm never communicated directly with the investors, but merely

16

prepared opinion letters with knowledge that First Western was distributing those letters to potential investors.

In Ackerman v. Schwartz, 947 F.2d 841 (7th Cir. 1991), attorney Howard Schwartz wrote an opinion letter which allegedly recited untrue "facts." The court of appeals held: "Although the lack of duty to investors means that Schwartz had no obligation to blow the whistle, and none to correct a letter he had not authorized to be circulated in the first place . . . , Schwartz cannot evade responsibility to the extent he permitted the promoters to release his letter." Id. at 848 (internal citations omitted). The court concluded that, if Schwartz authorized the inclusion of his letter with the offering documents, Schwartz could be liable as a principal, and not merely as an aider and abettor. Id. According to the court: "In order to recover from a professional for a report rendered to his client, the third party must establish that the professional was aware that the report would be used for a particular purpose, in furtherance of which a known person would rely, and the professional must show an understanding of this impending reliance." Id. at 846.

If Drinker had prepared signed opinion letters, or other documents acknowledging Drinker's preparation and/or endorsement of the documents, for distribution to the investors that were materially misleading, we would have little difficulty acknowledging Drinker's liability for a primary violation of section 10(b) and Rule 10b–5, assuming the other requirements of liability were met. With one exception which we do not deem material to the outcome of this case, however, Drinker did not sign any documents for distribution to the investors.6 Indeed, the investors concede that they did not know about Drinker's involvement with Mercer LP until after they invested. We are thus faced with a question far more difficult than the one we answered in

_____

6. Calhoun sent a complete set of executed partnership documents to the investors after Elyse, Richard and Doris confirmed their 1993 investments and acknowledged that they had received and reviewed the materials provided in the November Disclosure Package. The investors do not contend that they relied on Calhoun's cover letter as Drinker's representation that the disclosure documents were accurate and complete.

17

Kline: Whether a lawyer who participated in the drafting of a client's fraudulent document may be held primarily liable to a third-party investor under the federal securities laws for the material misstatements or omissions contained in the document, when the lawyer did not sign or endorse the document and the investor is therefore unaware of the lawyer's role in the fraud.

We conclude that lawyers and other secondary actors who significantly participate in the creation of their client's misrepresentations, to such a degree that they may fairly be deemed authors or co-authors of those misrepresentations, should be held accountable as primary violators under section 10(b) and Rule 10b-5 even when the lawyers or other secondary actors are not identified to the investor, assuming the other requirements of primary liability are met. To obtain relief under section 10(b) and Rule 10b-5, a private plaintiff must show, inter alia, that he or she relied on a misleading statement of the defendant and suffered an economic loss as a proximate result. Scattergood, 945 F.2d at 622. Section 10(b) and Rule 10b-5 require the plaintiff to demonstrate reliance on the misleading statement; they do not require the plaintiff to demonstrate that he or she relied on the defendant's role in the preparation or dissemination of the statement. When an investor reasonably relies on a materially misleading statement in connection with the purchase or sale of a security, the author of the statement should not be allowed to escape liability under the federal securities laws merely because the author is unknown to the investor.

In In re ZZZZ Best Sec. Litig., 864 F. Supp. 960 (C.D. Cal. 1994), investors alleged that ZZZZ Best perpetrated a fraud in connection with the sale of ZZZZ Best securities. The plaintiffs also alleged that Ernst & Young was liable for its involvement in the creation, review and issuance of approximately thirteen publicly released statements related to the scheme. None of the statements attributed its existence to Ernst & Young or even hinted that thefirm might have been involved in the issuance of any of the statements. Id. at 965. Ernst & Young argued that those statements released to the public by ZZZZ Best and attributable only to ZZZZ Best or others, even if reviewed,

18

edited or approved by Ernst & Young, were not actionable against Ernst & Young as violations of section 10(b) and Rule 10b-5.

The investors countered that if a "secondary actor" such as Ernst & Young actively participates in the creation of a materially misleading statement issued by a "primary actor" such as ZZZZ Best, then the so-called secondary actor has committed a primary violation of section 10(b). According to the plaintiffs, since Ernst & Young was actively involved in the writing and reviewing of the financial reports and press releases provided to the public by ZZZZ Best, and since Ernst & Young knowingly included information which was misleading in the documents, Ernst & Young committed a primary violation of section 10(b) and Rule 10b-5.

The court agreed with the investors. Id. at 970. Acknowledging that the investors might not have been able to attribute the misstatements and omissions directly to Ernst & Young, the court reasoned that the investors still relied on the statements. According to the court,"anyone intricately involved in their creation and the resulting deception should be liable under Section 10(b)/Rule 10b-5." Id.

Ernst & Young specifically challenged the investors' omissions-based claim on the ground that an alleged failure to act cannot give rise to a section 10(b) claim unless the investors establish a relationship with the defendant which gives rise to a duty to disclose. While agreeing with this general proposition, the court noted that "a general duty does exist to communicate any additional information, which in its absence would render misleading that which was already communicated." Id. at 971. If Ernst & Young was found to have sufficiently participated in the preparation of the misrepresentations and omissions such that they were attributable to the firm, the court reasoned, then Ernst & Young would have a duty to disclose or correct these previously released misrepresentations. Id. We find the reasoning of the court in ZZZZ Best to be persuasive.

Drinker contends that it did not have a duty to "blow the whistle" on Mercer LP. It is reasonably clear that mere

19

silence, absent a duty to speak, is not actionable under section 10(b) or Rule 10b-5. Chiarella v. United States, 445 U.S. 222, 235 (1980). Drinker also contends that it did not owe a fiduciary duty to the investors. We do not disagree. Our analysis does not end there, however. The investors contend, and we agree, that a duty to disclose may arise either from a fiduciary relationship or from affirmative representations that omit a material fact such that the representations made are misleading.

We need not address the issue of whether a lawyer has an absolute duty to "blow the whistle" on his client. Instead, we are convinced that, as with the facts alleged here, when a lawyer elects to speak, the lawyer does have a duty to speak truthfully. See 17 C.F.R.S 240.10b-5 (making it unlawful to "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading"); see also Kline, 24 F.3d at 491 (when law firm elects to speak, it assumes the duty to communicate any additional or qualifying information, then known, the absence of which would render misleading that which was communicated). The fact that the lawyer is speaking "behind the scenes" does not absolve the lawyer of this duty. When a lawyer prepares a document with knowledge that the document will be distributed to investors, the lawyer has elected to speak to the investors, even though the document may not be facially attributed to the lawyer. While Drinker did not owe a fiduciary duty to the investors to "blow the whistle" on Mercer LP, Drinker did have a duty to correct material omissions contained in its statements.

We do not suggest that a lawyer who merely provides "substantial assistance" to a client may be liable under section 10(b) and Rule 10b-5. Such a holding would be inconsistent with the Supreme Court's rejection of a private cause of action for aiding and abetting. See Central Bank of Denver, 511 U.S. at 168 (listing "substantial assistance given to primary violator" as one element of rejected aiding and abetting cause of action). Rather, we believe that a person may be liable for a primary violation of section 10(b) and Rule 10b-5 when the person's participation in the creation of a statement containing a misrepresentation or

20

omission of material fact is sufficiently significant that the statement can properly be attributed to the person as its author or co-author. At that point, the person has done more than provide mere substantial assistance; the person has become a primary violator of section 10(b) and Rule 10b-5, assuming that the other requirements of section 10(b) and Rule 10b-5 are satisfied. This is true even if the investor is unable to attribute the statement to the person at the time of the transaction.

We hold that when a person participates in the creation of a statement for distribution to investors that is misleading due to a material misstatement or omission, but the person is not identified to the investors, the person may still be liable as a primary violator of section 10(b) and Rule 10b-5 so long as (1) the person knows (or is reckless in not knowing) that the statement will be relied upon by investors, (2) the person is aware (or is reckless in not being aware) of the material misstatement or omission, (3) the person played such a substantial role in the creation of the statement that the person could fairly be said to be the "author" or "co-author" of the statement, and (4) the other requirements of primary liability are satisfied.

Our holding is not without precedent. In In re Software Toolworks Inc. Sec. Litig., 50 F.3d 615 (9th Cir. 1994), the plaintiffs alleged that accountants violated section 10(b) by participating in the drafting of two letters sent by their client to the SEC. While the first letter specifically referred to the accountants, the Court of Appeals for the Ninth Circuit concluded that the second letter, which was not attributed to the accountants, could also support section 10(b) liability. According to the court, those who "played a significant role in drafting and editing" the second letter may be primarily liable under section 10(b). Id. at 628 n.3. The court determined that a reasonable factfinder could conclude that the accountants, "as members of the drafting group, . . . had access to all information that was available and deliberately chose to conceal the truth." Id. at 629; see also Cashman v. Coopers & Lybrand, 877 F. Supp. 425, 432 (N.D. Ill. 1995) (primary liability can be established by showing an accountant's "central involvement" in the preparation of material).

21

We believe that our holding is faithful to Central Bank of Denver. As noted above, we do not consider mere substantial assistance to be sufficient to establish primary liability under section 10(b) and Rule 10b–5. Rather, we conclude that when a person's participation in the creation of a statement is significant enough that the person may be considered the statement's "author" or "co-author," then the statement upon which the plaintiff relies is "made" by the person such that primary liability may attach under section 10(b) and Rule 10b–5 so long as the other requirements of primary liability are satisfied.

In addition, nothing in the standard we adopt today is inconsistent with Anixter v. Home-Stake Prod. Co., 77 F.3d 1215 (10th Cir. 1996). In Anixter, the Court of Appeals for the Tenth Circuit stated that the "critical element separating primary from aiding and abetting violations is the existence of a representation, either by statement or omission, made by the defendant, that is relied upon by the plaintiff." Id. at 1225. We do not disagree with the Anixter standard; we agree that primarily liability under section 10(b) and Rule 10b–5 will only attach to a secondary actor when that actor makes a false or misleading statement. Our holding today is meant only to clarify the circumstances under which a statement may fairly be said to have been "made" by a secondary actor.7

Viewing the facts of this case in a manner most favorable to the investors, we conclude that plaintiffs have adduced sufficient evidence to create an issue of material fact as to whether (1) Drinker was an author or co-author of the disclosure documents; (2) Drinker knew that those documents would be relied upon by the investors; and (3)

_____

7. The Anixter court notes that to the extent cases like ZZZZ Best and Software Toolworks "allow liability to attach without requiring a representation to be made by defendant" they do not comport with Central Bank of Denver. Anixter, 77 F.3d at 1226 n.10. We do not, however, read these cases as allowing liability absent a statement made by the secondary actor. Rather, these cases articulate circumstances in which a secondary actor's participation in the creation of the fraudulent statement is so significant that the secondary actor can fairly be said to have made the statement. We therefore find that both ZZZZ Best and Software Toolworks faithfully adhere to Central Bank of Denver.

Drinker knew that material information was omitted from those documents. As a result, Drinker had a duty to ensure that the statements it made in the November Disclosure Package and May Disclosure Letter did not contain misstatements or omissions of material fact.8 The investors have proffered sufficient evidence at this stage to demonstrate that Drinker did not fulfill its duty.

C.

The district court also concluded that the investors failed to demonstrate a genuine issue of material fact on the issue of scienter. Scienter is a necessary element of a cause of action under section 10(b) and Rule 10b-5. In re Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1242 (3d Cir. 1989). Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." Id. at 1244 (quotations omitted); accord Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976). Scienter may be found "only where there is intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." Phillips Petroleum, 881 F.2d at 1244 (quotations omitted). It is insufficient to show mere negligent conduct. Eisenberg v. Gagnon, 766 F.2d 770, 776

_____

8. In order for an omission or misstatement to be actionable under section 10(b) or Rule 10b-5, the omission or misstatement must be material; that is, it must alter the total mix of relevant information for a
reasonable investor making an investment decision. In re Burlington Coat Factory Sec. Litig, 114 F.3d 1410, 1425-26 (3d Cir. 1997); cf. TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976) (omitted fact is material if there is substantial likelihood that omitted fact would have assumed actual significance in deliberation of reasonable investor). Questions of materiality have traditionally been viewed as particularly appropriate for the trier of fact. Burlington Coat Factory, 114 F.3d at 1426. Where alleged misrepresentations or omissions are obviously unimportant, however, courts may rule them immaterial as a matter of law. Id.

The parties do not address the materiality question on appeal. It is reasonably clear to us that the omitted facts regarding Coleman's compliance history and restrictions and Mercer LP's restrictions were material. The omitted facts regarding Boyd and Schappell might also be material under the circumstances. It is appropriate in this case to leave the question of materiality to the trier of fact.

23

(3d Cir. 1985). Scienter must be proven by showing that "the defendant lacked a genuine belief that the information disclosed was accurate and complete in all material respects." Phillips Petroleum, 881 F.2d at 1244 (quotations omitted).

A showing of recklessness on the part of the defendant is sufficient to establish scienter for a claim under section 10(b) and Rule 10b-5. Id. Recklessness is defined as "an extreme departure from the standards of ordinary care . . . which presents a danger of misleading . . . that is either known to the defendant or is so obvious that the actor must be aware of it." Id. (quotation omitted). We have long recognized that circumstantial evidence may often be the principal, if not the only, means of proving scienter. Id. at 1248; McLean v. Alexander, 599 F.2d 1190, 1198 (3d Cir. 1979).

We conclude that the investors have demonstrated the existence of a genuine issue of material fact on the issue of scienter. Viewing the facts in the light most favorable to the investors, a trier of fact could reasonably find the following: (1) Strouse knew that Mercer LP, through Coleman, improperly solicited the investors' original investments without making the necessary disclosures; (2) Strouse knew in May 1993 that the investors never received the February Disclosure Package and therefore never had an opportunity to rescind their original investments; (3) although Strouse encouraged Mercer LP to distribute the package in May 1993, he never attempted to determine whether the package was subsequently delivered; (4) Strouse knew that Mercer LP and Coleman faced numerous regulatory difficulties throughout 1993 that presented severe difficulties for Mercer LP's financial future; (5) in September or October 1993, Strouse knew that Mercer LP, possibly through Coleman, had once again solicited substantial investments from the investors without distributing necessary disclosures; and (6) Strouse prepared the November Disclosure Package and May Disclosure Letter without including the material information that was contained in the undelivered February Disclosure Package and without including material information about his client's 1993 difficulties.

24

From the above facts, it would be reasonable for a trier of fact to infer that Strouse, who knew that Mercer LP and the investors' investments were in serious trouble, was concerned about his representation of Mercer LP and the behavior of his client. Although Strouse was not necessarily in a position to prevent Mercer LP from engaging in various misdeeds throughout its existence, a trier of fact could reasonably infer that Strouse did not do all that he should have done to ensure that his clients complied with the law and distributed the February Disclosure Package. A trier of fact might infer that Strouse was concerned that disclosure of the Coleman and Mercer LP information would lead to the investor's decision to rescind their investments, thus causing the downfall of Mercer LP and the exposure of possible oversights in Strouse's representation of Mercer LP. A trier of fact might reasonably infer that Strouse concealed this information in an effort to avoid rescission in the hope that Mercer LP would remain solvent and possible oversights would never be discovered. In sum, a trier of fact might reasonably infer that Drinker intentionally concealed material information from the November and May disclosure documents, and that it was motivated by a desire to avoid the financial and reputational repercussions that could follow from the investors' anticipated decision to rescind their investments. In other words, a trier of fact might reasonably conclude that Drinker acted with scienter.

Or it might not. Drinker offers several explanations for its decision not to include the information about Coleman and Mercer LP in the November Disclosure Package and the May Disclosure Letter. We need not decide whether Drinker in fact acted with scienter when it decided to exclude certain information from the November and May disclosure documents. It is sufficient that we decide that a trier of fact could so conclude.

D.

On appeal, the investors contend that they submitted evidence that Drinker engaged in a conspiracy to violate section 10(b) and Rule 10b-5. Drinker counters that the Supreme Court's rationale in support of its decision

refusing to recognize a private cause of action for aiding and abetting in Central Bank of Denver also precludes recognition of a private cause of action for conspiracy.9 As the district court found, however, the investors did not plead a conspiracy claim in their amended complaint. A complaint must provide "fair notice of what the plaintiff's claim is and the grounds upon which it rests." Krouse v. American Sterilizer Co., 126 F.3d 494, 500 n.1 (3d Cir. 1997) (quotation omitted). Drinker was not placed on fair notice that the investors intended to pursue a conspiracy claim.10 Since the investors did not pursue a conspiracy claim in their amended complaint, we need not decide whether such a claim would be viable in the wake of Central Bank of Denver.

III.

The investors also pled a cause of action for common law fraud. In Pennsylvania, a cause of action for common law fraud, or intentional misrepresentation, contains the following elements:

> (1) a representation; (2) which is material to the
> transaction at hand; (3) made falsely, with knowledge

_____

9. Compare Central Bank of Denver, 511 U.S. at 200 n.12 (Stevens, J., dissenting) ("The Court's rationale would sweep away the decisions recognizing that a defendant may be found liable in a private action for conspiring to violate S 10(b) and Rule 10b-5."), In re GlenFed, Inc. Sec. Litig., 60 F.3d 591, 592 (9th Cir. 1995) (holding that Supreme Court's rationale in Central Bank of Denver precludes private right of action for conspiracy liability), and In re MTC Elec. Techs. Shareholders Litig., 898 F. Supp. 974, 981-82 (E.D.N.Y. 1995) (same), with In re Towers Fin. Corp. Noteholders Litig., 936 F. Supp. 126, 129-30 (S.D.N.Y. 1996) (holding that Central Bank of Denver does not preclude private cause of action for conspiracy liability), and Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin, 945 F. Supp. 84, 85-86 (S.D.N.Y. 1996) (same).

10. A vague comment in paragraph 113 of the amended complaint's background section that the defendants "acted in concert together to aid and abet one another in order to obtain investments from Elyse, Richard & Doris, and Warren" is insufficient to place Drinker on fair notice that the investors intended to pursue a conspiracy claim. See Krouse, 126 F.3d at 499-500 n.1.

26

of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994). The companion tort of fraudulent concealment or non-disclosure has the same elements as the tort of intentional misrepresentation except that in a case of intentional non-disclosure the party, with intent to deceive, intentionally conceals a material fact rather than making an affirmative misrepresentation. Id. at 889 n.12.

To be liable for material non-disclosure in Pennsylvania, a party must first have a duty to speak. Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 611-12 (3d Cir. 1995). That duty may arise when disclosure is necessary to prevent an ambiguous or partial statement from being misleading; it may also arise in certain circumstances when the undisclosed fact is basic to the transaction. Restatement (Second) of Torts S 551. For the reasons discussed above in connection with the federal securities claim, we conclude that a trier of fact could reasonably conclude that Drinker had a duty to speak when it prepared the disclosure documents.11 We therefore conclude that the district court improperly granted Drinker's motion for summary judgment on the investors' common law fraud claim.12

_____

11. We have noted an uncertainty regarding the extent to which Pennsylvania law includes the Restatement's discrete criteria for when a duty to speak arises. Duquesne Light, 66 F.3d at 612. Given the significance of the omitted facts concerning Coleman and Mercer LP, the nature of the transaction, and Drinker's role in the transaction, however, we predict that the Pennsylvania Supreme Court wouldfind a duty to speak in this case.

12. Focusing exclusively on Pennsylvania law, the district court did not consider whether Warren's or Elyse's common law fraud claims should be decided under Massachusetts law. On remand, the district court should consider this issue in the first instance. See, e.g., Greenery Rehabilitation Group, Inc. v. Antaramian, 628 N.E.2d 1291, 1294 (Mass. App. Ct. 1994) (discussing duty to disclose, citing Restatement (Second)

27

IV.

The investors contend that Drinker is liable for conspiracy and aiding and abetting under RICO. Reasoning that Drinker did not owe the investors a duty to disclose material information and that the investors failed to adduce evidence of fraudulent intent, the district court granted Drinker's motion for summary judgment on these claims. Although, for reasons stated elsewhere in this opinion, we disagree with the district court's reasoning, we will nonetheless affirm the judgment of the district court because the investors' RICO claims fail as a matter of law.

A.

Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. S 1962(c). In Reves v. Ernst & Young, 507 U.S. 170 (1993), the Supreme Court limited the class of persons subject to liability under this section. The Court held that "one is not liable under[section 1962(c)] unless one has participated in the operation or management of the enterprise itself." Id. at 183. In order to "participate" in the conduct of the enterprise's affairs, the Court held, "one must have some part in directing those affairs." Id. at 179.

According to the Court, "[a]n enterprise also might be `operated' or `managed' by others `associated with' the enterprise who exert control over it as, for example, by bribery." Id. at 184. Thus, "outsiders" may be liable under

_____

of Torts S 551); see also Royal Bus. Group, Inc. v. Realist, Inc., 933 F.2d 1056, 1065 (1st Cir. 1991) (under Massachusetts law, one who "chooses to make a disclosure shoulders certain responsibilities of completeness and accuracy").

Under either Pennsylvania or Massachusetts law, Elyse's common law fraud claim is not time barred. See 42 Pa. Cons. Stat. Ann. S 5524(7) (two-year limitations period in Pennsylvania); Mass. Gen. Laws ch. 260, S 2A (three-year limitations period in Massachusetts).

section 1962(c) if they participate in the operation or management of the enterprise itself. Id. at 185.

The investors have proffered evidence suggesting that Drinker, with scienter, concealed material information from documents it knew would be given to the investors by its client. This is insufficient to support a rational inference, much less a finding, that Drinker participated in the "operation or management" of the Mercer RICO enterprise. Drinker may have assisted Mercer LP, and Drinker's legal services may have benefitted the Mercer enterprise. As a matter of law, however, there is no evidence suggesting that Drinker directed, operated or managed the Mercer enterprise's affairs. See, e.g., Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison, 955 F. Supp. 248, 254 (S.D.N.Y. 1997) ("the provision of professional services by outsiders, such as accountants, to a racketeering enterprise, is insufficient to satisfy the participation requirement of RICO, since participation requires some part in directing the affairs of the enterprise itself "); see also Reves, 507 U.S. at 185–86 (allegation that accountant's audit reports concealed cooperative's insolvency insufficient to establish participation in "operation and management" of RICO enterprise); University of Md. at Baltimore v. Peat, Marwick, Main & Co., 996 F.2d 1534, 1539 (3d Cir. 1993) (policyholders failed to state RICO claim against insurer's independent auditor where claim was based solely on alleged preparation of false and misleading financial statements for insurer); In re American Honda Motor Co. Dealerships Relations Litig., 941 F. Supp. 528, 560 (D. Md. 1996) ("Th[e] cases reveal an underlying distinction between acting in an advisory professional capacity (even if in a knowingly fraudulent way) and acting as a direct participant in [an enterprise's] affairs."); cf. Handeen v. Lemaire, 112 F.3d 1339, 1347–51 (8th Cir. 1997) (where debtor allegedly relinquished considerable control over Chapter 13 estate to lawyer, who took lead in making important decisions concerning operation of RICO enterprise, factfinder could conclude that lawyer participated in conduct of alleged RICO enterprise under section 1962(c)). Indeed, the investors do not contend on

appeal that Drinker committed a primary violation of section 1962(c).13

B.

The investors do contend that Drinker is liable as a conspirator under section 1962(d) for conspiracy to violate section 1962(c). Section 1962(d) provides that it is unlawful for any person to conspire to violate section 1962(a), (b), or (c). 18 U.S.C. S 1962(d).

In United States v. Antar, 53 F.3d 568 (3d Cir. 1995), we recognized that "a number of courts have held that even if a person may not be held directly liable for violating section 1962(c), he or she still may be liable [under section 1962(d)] for conspiring to violate section 1962(c)." Id. at 580 (collecting cases). We disagreed with this broad proposition. We held that while Reves still permits a RICO conspiracy claim to be brought against a defendant who conspired to operate or manage an enterprise, no cause of action will lie against a defendant for conspiring with someone who is operating or managing the enterprise. Id. at 581. We justified the distinction between "conspiring to operate" and "conspiring with someone who is operating" as follows:

> [I]n the former situation, the defendant is conspiring to do something for which, if the act was completed successfully, he or she would be liable under section 1962(c). But in the latter scenario, the defendant is not

_____

13. On appeal, the investors contend that Mercer LP was the relevant RICO enterprise. Since Drinker did not operate, manage or direct Mercer LP as a matter of law, it cannot be liable under section 1962(c). In their amended complaint, the investors also alleged that the association between all the defendants, including Drinker, "constituted an `association-in-fact,' which also constituted an enterprise under RICO." Am. Compl. P 141. Since the investors did not pursue this argument on appeal, we need not decide whether the association between Drinker and the Mercer defendants could constitute a separate enterprise under RICO. In any event, we have serious doubts that this purported association-in-fact would be considered a RICO enterprise since it does not appear to be separate and apart from the pattern of racketeering activity in which it allegedly engaged. See United States v. Pelullo, 964 F.2d 193, 211 (3d Cir. 1992).

30

conspiring to do something for which he or she could
be held liable under the substantive clause of the
statute. Therefore, liability should not attach.

Id. (footnote omitted). In other words, it is not sufficient
that Drinker conspired with Coleman in Coleman's alleged
violation or attempted violation of section 1962(c). Rather,
Drinker could only be liable under section 1962(d) for
conspiring to do something for which, if the act was
completed successfully, Drinker itself would be liable under
section 1962(c). Since Drinker, who did not participate in
the "operation or management" of the Mercer RICO
enterprise, did not conspire to do something for which, if
the act was completed successfully, it would be liable under
section 1962(c), Drinker cannot be liable for conspiring to
violate section 1962(c) as a matter of law. Accordingly, the
investors' section 1962(d) conspiracy claim against Drinker
cannot stand.14

C.

Finally, the investors contend that Drinker is liable for
aiding and abetting a RICO violation. In Jaguar Cars, Inc.
v. Royal Oaks Motor Car Co., 46 F.3d 258 (3d Cir. 1995), we
observed that in prior cases "[w]e have held that a
defendant may be liable under RICO if he aided or abetted
the commission of at least two predicate acts." Id. at 270.
Without further considering the existence of a private cause
of action for aiding and abetting under RICO, we held that
in order to find a defendant liable for aiding and abetting

_____

14. In their briefs, the investors repeatedly note that in Antar, we
recognized that other courts have held that liability attaches against a
conspirator under section 1962(d) even if section 1962(c) liability is
unavailable. The investors fail to disclose, however, that we specifically
rejected this line of authority and concluded that no cause of action will
lie against a defendant for conspiring with someone who is operating or
managing an enterprise. Antar, 53 F.3d at 581. We call to the investors'
attention Third Circuit Local Appellate Rule 28.3(b) which provides that
for each legal proposition supported by citations in the argument,
"counsel shall cite to any opposing authority if such authority is binding
on this Court, e.g., . . . published decisions of this Court." 3d Cir. R.
28.3(b) (emphasis supplied).

31

under RICO, a plaintiff must prove "(1) that the substantive act has been committed, and (2) that the defendant alleged to have aided and abetted the act knew of the commission of the act and acted with intent to facilitate it." Id. For reasons discussed elsewhere in this opinion, we believe that the investors have offered sufficient evidence to establish a genuine issue of material fact on both elements.

Nonetheless, we will still affirm the judgment of the district court insofar as it dismissed the investors' RICO aiding and abetting claim against Drinker because we are convinced that a private cause of action for aiding and abetting a RICO violation cannot survive the Supreme Court's decision in Central Bank of Denver. There the Supreme Court held that a private plaintiff may not maintain an aiding and abetting suit under section 10(b). Central Bank of Denver, 511 U.S. at 191. According to the Court, "the text of the statute controls" the scope of the conduct prohibited by section 10(b). Id. at 173. Reasoning that the text of section 10(b) does not reach those who aid and abet a section 10(b) violation, the Court concluded that "the statute itself resolves the case." Id. at 177-78.15

Following the rationale of Central Bank of Denver, we are constrained to conclude that there is not a private cause of action for aiding and abetting a RICO violation. Just as the text of section 10(b) did not address aiding and abetting liability, the text of section 1962 does not contain any indication that Congress intended to impose private civil aiding and abetting liability under RICO. This silence "bodes ill" for the investors. Central Bank of Denver, 511 U.S. at 175.

Under the reasoning of Central Bank of Denver, our obligation is to "interpret and apply the law as Congress has written it, and not to imply private causes of action

_____

15. Although Congress has enacted a general aiding and abetting statute applicable to all federal criminal offenses, 18 U.S.C. S 2, it has not enacted a general civil aiding and abetting statute. See Central Bank of Denver, 511 U.S. at 181-82. Thus, the enactment of a statute creating private civil liability for a primary violation of a statute does not give rise
to a general presumption that such liability extends to aiders and abettors. Id. at 182.

32

merely to effectuate the purported purposes of the statute."
In re Lake States Commodities, Inc., 936 F. Supp. 1461,
1475 (N.D. Ill. 1996). "The issue," the Supreme Court said,
"is not whether imposing private civil liability on aiders and
abettors is good policy but whether aiding and abetting is
covered by the statute." Central Bank of Denver, 511 U.S.
at 177. Thus, even though "[c]ivil RICO liability for aiding
and abetting advances RICO's goal of permitting recovery
from anyone who has committed the predicate offenses,
regardless of how he committed them," Jaguar Cars, 46
F.3d at 270 (quotation omitted), we conclude that it is for
Congress, not the courts, to fix the scope of the RICO
statute. The text of the RICO statute controls its scope; the
text does not permit us to recognize a private cause of
action of aiding and abetting a RICO violation. See Hayden,
955 F. Supp. at 255–56 (holding that claim of aiding and
abetting RICO violation must be dismissed "in accordance
with the policies articulated in Central Bank of Denver");
Lake States Commodities, 936 F. Supp. at 1475–76 (same);
Department of Econ. Dev. v. Arthur Anderson & Co., 924 F.
Supp. 449, 475–77 (S.D.N.Y. 1996) (same).

We reach this result despite our discussion of aiding and
abetting liability in Jaguar Cars, a case that was decided
after Central Bank of Denver. In Jaguar Cars, we did not
consider the impact of Central Bank of Denver  on earlier
cases which had permitted a private cause of action for
aiding and abetting under RICO. The only aiding and
abetting issue before us in Jaguar Cars was whether the
evidence at trial was sufficient to find one liable for aiding
and abetting; the existence of the cause of action was
presumed by the parties, and we did not raise the issue sua
sponte. Notwithstanding the fact that a panel of this court
is bound by, and lacks authority to overrule, a published
decision of a prior panel, 3d Cir. I.O.P. 9.1, we conclude
that the panel's discussion of a private cause of action for
aiding and abetting a RICO violation in Jaguar Cars is not
conclusive here because the Supreme Court's opinion in
Central Bank of Denver was not called to the panel's
attention, and the opinion did not explicitly or implicitly
decide the impact of Central Bank of Denver on the issues
raised in that appeal. Cf. Jaguar Cars, 46 F.3d at 266 n.6.

V.

We review the district court's denial of the investors' motion for leave to amend their complaint for abuse of discretion. In re Burlington Coat Factory Sec. Litig, 114 F.3d 1410, 1434 (3d Cir. 1997). Leave to file an amended complaint is to be "freely given when justice so requires." Fed. R. Civ. P. 15(a). When, however, the proposed amendments are futile (e.g., when they would not withstand a motion to dismiss), the district court should decline to allow the amendment. Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co., 113 F.3d 405, 419 (3d Cir. 1997). In assessing futility, the district court should apply the same standard of legal sufficiency applied under Rule 12(b)(6). Burlington Coat Factory, 114 F.3d at 1434.

A.

We will affirm the judgment of the district court insofar as it denied the investors' motion for leave to amend their complaint to state a cause of action under section 9.2(a) of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTP/CPL"), Pa. Stat. Ann. tit. 73, S 201–9.2(a), which creates a private right of action for consumers injured in the purchase or lease of goods or services. The investors claim that they were injured in the purchase of goods. In Algrant v. Evergreen Valley Nurseries Ltd. Partnership, 126 F.3d 178 (3d Cir. 1997), however, we held that investment securities are not "goods" under the UTP/CPL. Id. at 187–88. But see id. at 191–92 (Mansmann, J., dissenting) (concluding that investment securities are "goods" when they are purchased primarily for personal, family or household purposes).

Unlike the Pennsylvania UTP/CPL, the Massachusetts Consumer Protection Act applies to securities transactions. See Mass. Gen. Laws, ch. 93A, S 2(a) ("Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."); id. S 1(b) (sale of securities is "trade" or "commerce"). Nonetheless, we will affirm the judgment of the district court insofar as it denied the investors' motion for leave to amend their complaint to add a cause of action

34

for violation of the Massachusetts consumer protection law. Privity is not required to maintain a fraud-based action under chapter 93A "so long as the parties are engaged in more than a minor or insignificant business relationship." Standard Register Co. v. Bolton-Emerson, Inc., 649 N.E.2d 791, 795 (Mass. App. Ct. 1995). Here, the investors did not have any contractual or business relationship with Drinker. Accordingly, the investors may not pursue a chapter 93A claim against Drinker. Cf. Nei v. Boston Survey Consultants, Inc., 446 N.E.2d 681, 683 (Mass. 1983) (land surveyor, hired by seller of property, was not liable to buyer for failure to disclose high water table which increased cost of constructing septic tank).

B.

The investors also attempted to amend their complaint to add a cause of action under the Pennsylvania Securities Act, Pa. Stat. Ann. tit. 70, S 1-101 et seq. Section 401 of the Pennsylvania Act closely parallels section 10(b) of the 1934 federal securities act.[16] Unlike courts interpreting the federal securities act, however, courts interpreting the Pennsylvania Securities Act have not implied a private cause of action for violations of section 401. See, e.g., In re Catanella & E.F. Hutton & Co. Sec. Litig., 583 F. Supp. 1388, 1439 (E.D. Pa. 1984). Rather, courts look to section 501 of the act, which expressly provides, inter alia, that "[a]ny person who . . . offers or sells a security in violation of [section] 401 . . . shall be liable to the person purchasing the security from him." Pa. Stat. Ann. tit. 70, S 1-501(a).

_____

16. Section 401 provides:

   It is unlawful for any person, in connection with the offer, sale or
   purchase of any security in this State, directly or indirectly:
   (a) To employ any device, scheme or artifice to defraud;
   (b) To make any untrue statement of material fact or to omit to state
   a material fact necessary in order to make the statements made, in
   the light of the circumstances under which they are made, not
   misleading; or
   (c) To engage in any act, practice or course of business which
   operates or would operate as a fraud or deceit upon any person.

Pa. Stat. Ann. tit. 70, S 1-401.

The investors concede that Drinker was not a seller of securities and that they cannot, therefore, pursue a cause of action under the relevant portions of section 501.

The investors contend, however, that a private cause of action exists against Drinker pursuant to section 503. Section 503(a) states in pertinent part:

> Every affiliate of a person liable under section 501 or 502, . . . and every broker-dealer or agent who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person . . . .

Id. S 1-503(a). The plain language of section 503 dictates that an agent of a person who is liable under section 501 to an investor who purchased a security is jointly and severally liable to the investor, when the agent materially aids in the acts or transactions constituting the violation.

In Biggans v. Bache Halsey Stuart Shields, Inc., 638 F.2d 605 (3d Cir. 1980), we stated in dicta that the "sole source of liability for any acts in violation of sections 401, 403 and 404 of the Pennsylvania Securities Act . . . is found in section 501." Id. at 609 (emphasis omitted). Relying in part on Biggans, some district courts have held that an investor may not rely on section 503 to support a direct action against an agent; rather, the courts have held that section 503 "only establishes a cause of action in favor of a party who has been held liable to a private party under section 501." Penturelli v. Spector Cohen Gadon & Rosen, 640 F. Supp. 868, 871 (E.D. Pa. 1986); accord In re Phar-Mor, Inc. Sec. Litig., 892 F. Supp. 676, 688 (W.D. Pa. 1995). The district court followed this line of cases and concluded that the investors could not pursue a Pennsylvania Securities Act claim against Drinker under section 503.

In 1982, the Superior Court of Pennsylvania called into question our assumption in Biggans that the Pennsylvania Securities Act only provides causes of action against buyers and sellers. In Brennan v. Reed, Smith, Shaw & McClay, 450 A.2d 740 (Pa. Super. Ct. 1982), the court reasoned that the act "provides for joint and several liability among those primarily and/or secondarily liable under the act, and for the right of contribution between them." Id. at 747. The

36

court concluded that a lawyer "can be held liable to an investor as a violator of the Securities Act." Id. Although the underlying theory of liability asserted in Brennan was legal malpractice and not securities fraud, id., we believe that the court's reasoning is consistent with the plain language of section 503 and that an investor may bring a cause of action under the Pennsylvania Securities Act against an agent pursuant to section 503.

In assuming in Biggans that section 501 provides the exclusive avenue for private recovery for a violation of sections 401, 403 and 404, we did not consider the impact of section 503 in our analysis. McCarter v. Mitcham, 883 F.2d 196, 204 (3d Cir. 1989); accord Bull v. American Bank & Trust Co., 641 F. Supp. 62, 67 n.5 (E.D. Pa. 1986) (Biggans did not discuss "the scope of civil liability stemming from the interrelationship of SS 501 and 503"). After considering the plain language of section 503, and after reviewing the intervening decision of a Pennsylvania intermediate appellate court, we conclude that our dicta in Biggans was incorrect and we predict that the Pennsylvania Supreme Court would conclude that an investor may bring an action directly against an agent pursuant to section 503 of the Pennsylvania Securities Act.

The investors have proffered sufficient evidence to permit a factfinder to conclude that (1) Mercer LP is a"person liable under section 501," and (2) Drinker materially aided Mercer LP in the sale of securities to the investors. That does not completely answer the question, however, for we must also determine whether Drinker was an "agent" of Mercer LP. As defined by the Pennsylvania Securities Act, the term "agent" means "any individual, other than a broker-dealer, who represents a broker-dealer or issuer in effecting or attempting to effect purchases or sales of securities." Pa. Stat. Ann. tit. 70, S 1-102(c).

The provisions of the Pennsylvania Securities Act quoted here are based substantially upon the Uniform Securities Act. The comment to section 401 of the Uniform Act notes that whether a particular individual who represents an issuer is an "agent" depends "upon much the same factors which create an agency relationship at common law." Unif. Sec. Act S 401, 7B U.L.A. 581 (1985). Under Pennsylvania

37

common law, the attorney-client relationship is generally one of agency. See Weiner v. Lee, 669 A.2d 424, 428 (Pa. Commw. Ct. 1995), app. denied, 689 A.2d 237 (Pa. 1997). The statutory definition of "agent" in section 102, however, represents a deviation from the traditional common-law definition. We must, therefore, construe the meaning of the term "agent" as defined in the Pennsylvania Securities Act.

Our research did not reveal any Pennsylvania cases resolving the question of whether and when a lawyer may be considered an "agent" for purposes of the Pennsylvania Securities Act. We look, therefore, to see how other courts have dealt with this issue in states that have adopted the Uniform Securities Act definition of "agent."

The Court of Appeals of Wisconsin discussed the liability of lawyers who, the plaintiff alleged, had materially aided in the creation of a false and misleading prospectus in a limited partnership offering. Rendler v. Markos, 453 N.W.2d 202 (Wis. Ct. App. 1990). The court interpreted a statutory definition of "agent" that parallels the one at issue here, and it concluded:

> The definition of "agent" . . . does not include attorneys who merely render legal advice or draft documents for use in securities transactions. The definition covers persons who assist directly in offering securities for sale, soliciting offers to buy, or performing the sale, but who do not fit the definition of broker-dealer. It is not intended to cover professionals such as attorneys engaging in their traditional advisory functions.

Id. at 206; accord CFT Seaside Inv. Ltd. Partnership v. Hammet, 868 F. Supp. 836, 844 (D.S.C. 1994) (predicting South Carolina securities law containing parallel "agent" definition).

In Baker, Watts & Co. v. Miles & Stockbridge, 620 A.2d 356 (Md. Ct. Spec. App. 1993), the court construed a parallel definition of "agent" under the Maryland Securities Act. After conducting a thorough review of the interpretation of the term "agent" under similar laws in other states, the court concluded that the state securities laws "do not impose liability upon an attorney who merely provides legal services or prepares documents for his or her

client. To impose liability, the attorney must do something more than act as legal counsel." Id. at 368. The court held:

> [A]n attorney could conceivably be considered an agent if he or she "represents a broker-dealer or issuer in effecting or attempting to effect the purchase or sale of securities." In order to be considered an "agent," an attorney must act in a manner that goes beyond legal representation. The definition of "agent" . . . does not include attorneys who merely provide legal services, draft documents for use in the purchase or sale of securities, or engage in their profession's traditional advisory functions. To rise to the level of "effecting" the purchase or sale of securities, the attorney must actively assist in offering securities for sale, solicit offers to buy, or actually perform the sale.

Id. (emphasis omitted); see also Ackerman v. Schwartz, 733 F. Supp. 1231, 1252 (N.D. Ind. 1989) (lawyer who did not "personally and actively" employ opinion letter to solicit investors was not "agent," even where investors may have relied on opinion letter in making their investment decision; "[l]iability under the Indiana Securities Act requires something more than the mere drafting of an opinion letter"); accord Johnson v. Colip, 658 N.E.2d 575, 577-79 (Ind. 1995) (reviewing cases and following reasoning in Ackerman); cf. Excalibur Oil, Inc. v. Sullivan, 616 F. Supp. 458, 467 (N.D. Ill. 1985) (purchaser could pursue West Virginia securities action against seller's lawyer as seller's "agent" because lawyer played direct role in sale, including making "face-to-face and direct telephonic representations" to purchaser).

We are persuaded by this consistent interpretation of the term "agent" in this type of case. Under the Pennsylvania Securities Act, an individual is not an "agent" unless the individual "represents a broker-dealer or issuer in effecting or attempting to effect purchases or sales of securities." Pa. Stat. Ann. tit. 70, S 1-102(c). We hold that, although a lawyer or other professional could be considered an agent of their client under this definition, the person seeking to establish that the professional is an agent of the client must show more than a common-law agency relationship. As used in the Pennsylvania Securities Act, the term

39

"agent" does not include lawyers who merely render legal advice or draft documents for use in securities transactions. In order to be considered an "agent," a lawyer must act in a manner that goes beyond legal representation. The term covers individuals who actively assist in offering securities for sale, soliciting offers to buy, or performing the sale, but who do not fit the definition of broker-dealer.

Drinker does not meet this definition as a matter of law.[17] Since Drinker is not Mercer LP's agent for purposes of the Pennsylvania Securities Act, the investors may not sue Drinker under section 503. We will, therefore, affirm the judgment of the district court insofar as it denied the investors' motion to amend their complaint to add a cause of action under the Pennsylvania Securities Act.

We will also affirm the judgment of the district court insofar as it denied the investors' motion to amend their complaint to add a cause of action under the Massachusetts Uniform Securities Act, Mass. Gen. Laws ch. 110A, S 101 et seq. Like the Pennsylvania law, the Massachusetts law imposes liability on those who offer or sell securities. Id. S 410(a). In addition to the seller of the security, "every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller." Id. S 410(b). Also like the Pennsylvania Securities Act, the Massachusetts Act defines "agent" as "any individual other than a broker-dealer who represents a broker-dealer or issuer in effecting or attempting to effect purchases or sales of securities." Id. S 401(b). As discussed above, courts in other jurisdictions have consistently refused to hold a lawyer liable as an

_____

17. Our conclusion is supported by reference to the registration provisions of the Pennsylvania Securities Act: "It is unlawful for any person to transact business in this State as a broker-dealer or agent unless he is registered under this act." Pa. Stat. Ann. tit. 70, S 1-301(a).
Nowhere does the act require lawyers who merely advise persons involved in securities transactions to be registered as agents before providing that advice. The investors do not suggest that Drinker was required to register as an agent, and under the facts of this case, we conclude that it was not required to so register. Hence, Drinker cannot be considered an "agent" under the Pennsylvania Securities Act.

agent under parallel definitions of "agent." The investors do not point us to any Massachusetts case law that would suggest that the Massachusetts Supreme Judicial Court would deviate from this line of cases, and our research has not uncovered any. For the reasons discussed above, Drinker is not an agent as a matter of law.

VI.

We will reverse the judgment of the district court insofar as it granted Drinker's motion for summary judgment on the federal securities claims brought by Richard, Doris and Warren. We will reverse the judgment of the district court insofar as it granted Drinker's motion for summary judgment on the common law fraud claims brought by all of the investors. We will affirm the judgment of the district court in all other respects. We will remand for further proceedings consistent with this opinion.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

41